# Exhibit "B"

|  |  |
|---|---|
| **IN THE MATTER  between-**<br><br>**DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK**<br>              **Complainant-**<br><br>              **and-**<br><br>**JUANITA MURRAY**<br>              **Respondent**<br><br>**Pursuant to Education Law Section 3020-a** | **SED Case N0.  23-178**<br><br><br><br>**OPINION AND AWARD** |

**BEFORE:**          Haydeé Rosario, Esq.
                    Hearing Officer

**APPEARANCES:**

          For     Department of Education of the City of New York
                  Office of the General Counsel

          By:     Jade Fuller, Esq.

          For     Juanita Murray, Respondent
                  Office of Richard E. Casagrande

          By:      Brie Kluytenaar, Esq.

Pursuant to Section 3020-a of the Education Law, the New York City Department of Education ("the Department") filed charges against Juanita Murray ("Respondent" or "Murray"), a tenure employee, charging her with incompetence, inefficient service, insubordination and conduct unbecoming of her position during the 2010-2011, 2011-2012, and 2012-2013 school years. I was designated to serve as the hearing officer and to render a final and binding decision as to whether there is just cause for termination pursuant to Section 3020-a of the Education Law.

A pre-hearing conference was held on February 27, 2014, before Hearing Officer Michael Lazan, and the evidentiary hearings were held before me on

February 24, March 3, March 4, March 25, March 30, March 31, April 13, April 20, May 5, June 24, and June 25, 2015, at the offices of the Department located at 49-51 Chambers Street, New York, New York.

The parties were afforded a full and fair hearing, including the opportunity to present evidence, examine and cross-examine witnesses and make arguments in support of their respective positions.  Pursuant to Murray's request, the hearing was open to the public. All of the witnesses were sworn or affirmed. The record was closed upon submission of the parties' closing arguments.

The evidence adduced during the arbitration hearings, the arguments of the parties made during the hearings, and the arbitral precedents relied upon by the parties have been fully considered by the Hearing Officer in the preparation of this Opinion and its accompanying Award.[1]

## SPECIFICATIONS [2]

<u>See</u> a copy of the Amended Specifications attached as Attachment 1.

## BACKGROUND

Until the end of December 2012, when all of her caseload of mandated counseling cases was terminated, Murray, a Related Service Provider ("RSP"), with a Master of Science and Social Work from Columbia University School of Social Work and a License of Master in Social Work ("LMSW"), provided mandated individual and group counseling to students with special educational needs, as outlined in the students' Instruction Educational Plan ("IEP").  She also implemented other forms of interventions outlined in the students' IEPs. In addition to mandated services, the School also provides non-mandated counseling services to students who are determined to be "at risk."  Dr. Martin Friedmutter ("Dr. Friedmutter") evaluates the students to determine if they have special educational needs and creates the IEP goals related to the needs of each student.

Murray has worked for the Department for twenty-three years, and has been at MS 390 ("the School"), located in the Bronx, since September 2003. Robert Mercedes ("Principal Mercedes"), has been the School's principal since 1999.  The School serves about 400 students from 6th to 8th grades.   At all

---

[1] The transcript of this proceeding is referred to as Tr. followed by the number of the page unless otherwise indicated.
[2] Dept. Exhibit 1. Note that the Department withdrew Specifications 1 and 6.

material times, Lourdes Prieto-Lopez ("AP Lopez"), and Cinnamon Harris ("AP Harris"), were assistant principals at the School.  The following service providers provided, as assigned, the mandated and non-mandated individual and group counseling to the students: two social workers, including Guillermina Ceballos ("Ceballos"), two guidance counselors, including Susan Carr ("Carr") and Virginia Poe ("Poe"), and Related Service Providers, such as Murray.

**Specifications 2, 3, 5, 7, 9, 10, 11, 12, 13, 14, 17, 22, and 25, alleging that Murray failed to submit and/or complete requested information to demonstrate the impact of her counseling service on students, or to show what type of work Murray was doing; alleging that Murray failed to submit and/or complete information related to the IEPs of students that she was servicing; and alleging that she failed to implement recommendations given by the administration, are discussed together to facilitate the discussion and the analysis of these allegations.**

The Department presented Principal Mercedes, who testified as follows: he has been employed by the Department for about 23 years, and has worked as the Principal of the School since 1999. He has various Masters Degrees, including a Master in Early Childhood and a Master in Adult Education.  He does not have a degree or certification in the social work field or work experience as a social worker.[3] Principal Mercedes is licensed as a school supervisor and administrator.

**The 2010-2011 School Year**

Until 2010, Principal Mercedes testified he evaluated Murray in conjunction with a social worker. In April 2010, Principal Mercedes explained, during a restructuring of the School, he was directed by the Department to supervise Murray when the position of her former immediate in-discipline supervisor, who was a social worker, was eliminated. Consequently, when he was assigned to directly supervise Murray, Principal Mercedes also became the individual responsible for evaluating her performance. At the time he was assigned to supervise Murray, she was providing mandated individual and group counseling services to students with special needs with IEPs.  The goals, the type of counseling that was required, and the frequency of the mandated

---

[3] He testified that he attended certain professional development trainings provided by the Department and by an outside provider.

counseling is outlined in the IEPs in accordance with the applicable law and regulations.[4]

Principal Mercedes admitted that during the 2010-2011 school year, he did not observe Murray during any of her counseling sessions with the students. He testified that, at the time, he believed that the students would not feel comfortable talking to Murray while he was in the room. Principal Mercedes also conceded that prior to April 2010, he had never supervised a social worker.[5]  For these reasons, Principal Mercedes explained that he reached out to Rebecca Dewey ("Dewey"), the Director of the School's Support Services, to request her guidance and assistance with his newly assigned task of evaluating Murray's performance. In consultation with Dewey, he testified, he determined that to properly evaluate social workers and other service providers assigned to provide individual and group counseling to the students, it was essential for him to determine what kind of impact the counseling services were having on the students. He also explained that to properly evaluate her, Murray needed to demonstrate the students' emotional and academic growth as a result of the mandated counseling services that she provided.[6] In this regard, he pointed out, his evaluation of social workers turned on "whether [their] service was having a positive impact on the child."[7] He further explained that he needed to see tangible results: either by evidence that the student was receiving less disciplinary infractions, or that the student was making some academic gains, or some other form of written evidence of the students' growth. [8]

Thereafter, by two letters dated May 10, 2011, Principal Mercedes asked Murray that "in lieu of a formal observation" she needed to submit the goals, the strategies and techniques she utilized to assist students, and to submit evidence that the students were on track to meet the goals contained in their IEPs.[9]  Also, by letter dated May 10, 2011,[10] he asked Murray to provide him with "each specific goal" for three students identified in the letter and to provide him by May

---

[4] Tr. at 44-47
[5] Tr. at 47
[6] Tr. at 64
[7] Tr. at 65
[8] Tr. at 80-82
[9] Department Exhibits 2 and 3. The first letter states that the students were to be randomly selected and the second identified three students by name. Tr. 82-84
[10] Department Exhibit 4A

27, 2011, with information about the strategies and techniques that she was utilizing to assist those students.

In response to Principal Mercedes' requests, Murray submitted the students' IEPs to Principal Mercedes. He testified that that the IEPs were insufficient to satisfy his May 10th request because the IEPs contained no information about the impact of her services and/or how she was servicing the students assigned to her; and indicated that he explained to Murray, verbally and in writing, that the IEPs were not the kind of documentation that he was seeking.[11] He testified that he met with Murray to discuss his request regarding the services she was providing to her students.  In June, he testified, Murray submitted student attendance records identified as "RISA", progress reports, information and resources on techniques for counseling and a copy of the students' IEPs and related documentation.[12] Still, Principal Mercedes testified that the documentation submitted was not responsive to his request because he was seeking "evidence of growth."   He explained that "evidence of growth" was information or documentation that would show that the students were progressing. As an example, he again cited evidence of less disciplinary infractions or evidence of academic gains.  As part of his request, he did not ask for the academic infractions or academic records of the students assigned to Murray.  He also testified that he wanted to know the times that she had met with students and what exactly she was doing with them.[13] Principal Mercedes pointed out that due to Murray's failure to submit the documentation that he was seeking, Mercedes rated Murray's annual performance as "unsatisfactory" for the 2010-2011 school year.[14]

**The 2011-2012 School Year:**

At the beginning of the 2011-2012 school year, Principal Mercedes continued to assign Murray a caseload of mandated services. In addition, he directed her to provide non-mandated counseling to students at-risk during 10 periods. He explained that there was a reduction in non-mandated counseling

---

[11] Department Exhibit 5 and Tr. at 25
[12] Department Exhibits 7 and 7A
[13] Tr. at 149-150
[14] Department Exhibit 8 and Tr. 153

and he needed her to cover all of the non-mandated counseling.[15] By letter dated June 4, 2012, Principal Mercedes informed Murray that due to a reduction of the budget, she was assigned to provide non-mandated counseling to students at-risk under the guidance of Guillermina Ceballos ("Ceballos"), a social worker, who he described as an experienced social worker with many years of experience providing non-mandated counseling.[16]

By letter dated December 6, 2011, Principal Mercedes requested, in part, for Murray to meet with him and her Union representative to discuss a "lesson plan template" which he asked her to complete for her counseling sessions "to avoid an unsatisfactory rating."[17] At the hearing, he explained that he asked her to prepare lesson plans for him to know what type of coping skills she was going to be teaching and because he needed to "see if what she was teaching was effective".[18] He testified that she never provided any lesson plans even though he gave her a template for her to complete.[19]

Principal Mercedes indicated that Murray responded that the lesson plans were not within the scope of her work because she was not a teacher.[20] In rejecting Murray's assertion, during his testimony, Principal Mercedes insisted there is absolutely no difference between the role of a teacher and the role of a social worker or service provider who provides mandated and non-mandated counseling services to students. In this regard, he reasoned as follows:

> We as a school are responsible for outcomes...no longer we can get away with just chit chatting with [the] kids...We have to have structure...a period in which we are to address what is on the IEP...the plan was to give her an opportunity to focus her...to say this child needs this....and this is how we are going to address it where it could be put in writing...."[21]

Principal Mercedes also explained that he described to Murray multiple times the type of information and documentation that he wanted from her and indicated that he explained that the purpose was to determine "the impact" of her

---

[15] Department Exhibit 9
[16] Department Exhibit 12 and Tr. at 185
[17] Department Exhibit 11
[18] Tr. at 172-173 and 175
[19] Tr. at 176
[20] Tr. at 181
[21] Tr. at 181

mandated counseling services on the students assigned to her.[22] He insisted that, as per Dewey's advice, "We can no longer support counselors for chit chatting" without measurable outcomes.[23] For these reasons, he noted, he prepared a lesson plan template for Murray to complete with the goals contained in the students' IEPs.

By letter dated June 5, 2012,[24] Principal Mercedes requested for Murray to complete and submit the measureable annual goals for ten students identified in the letter and to identify the methods she utilized for servicing the students and to note the times when she met with the students. He testified that she never submitted the documentation.[25] By letter dated June 15, 2012, he again requested for her to submit the goals for the ten students previously identified and evidence that the students were on track to meet their goals.  In response, she submitted the students' IEPs, which contained the goals that she was required to follow, and explained that the goals were contained in the IEPs. Principal Mercedes, again, explained the IEPs were not sufficient because he needed to see evidence that the students had improved their coping skills  "even if it was not related to the counseling services [that] she was providing."[26] He also maintained that the IEPs are only a summary report and are not progress reports that reflect the kind of work that she was doing.[27]  Because of her failure to submit the requested documentation, Mercedes rated Murray's performance "unsatisfactory" for the 2011-2012 school year.[28]

**The 2012-2013 School Year**

At the beginning of the 2012-2013 school year, Principal Mercedes placed Murray on a remedial action plan he entitled, "Action Plan for Instructional Improvement," The action plan states that it was implemented because Principal Mercedes was "deeply concerned with [Murray's] lack of effective instruction" in 2011-2012 and that it intended to "improve the quality of instruction."[29] To this end, the action plan, he explained, intended to provide professional support and

---

[22] Tr. at 150-153
[23] Tr. at 182
[24] Department Exhibit 13
[25] Tr. at 191
[26] Tr. at 195
[27] Tr. at 195 and Department Exhibit 15 where he also note she failed to attend a meeting scheduled for June 13, 2012
[28] Department Exhibit 16
[29] Department Exhibit 17

assistance in various manners, including, meeting with Principal Mercedes, coaches and staff developers, formal and informal observations, workshops and inter-visitation and collection of lesson plans.  Principal Mercedes continued to reason that "instructing students" about coping skills and survival is the same as teaching other subjects such as science and math; and insisted there is no difference between teaching and counseling.[30] He also conceded that he used the Danielson Rubric, which he described as a framework for teaching, to evaluate Murray's performance.  He explained that he only used the Danielson Rubric components related to the skills of social workers and related to her specialty.[31]

As part of the action plan, he instructed Ceballos, the social worker, and Dr. Friedmutter, the psychologist, to meet with Murray to assist her with her goals and for her to learn how to service the students with IEPs.  He also assigned Patricia McKelvey, a retired special education teacher with many years of experience servicing students with IEPs.[32]

The action plan also directed Murray to attend pre-observation conferences to prepare for an observation by Principal Mercedes of her counseling sessions. Principal Mercedes testified that, in contrast to the 2010-2011 school year when he did not observe Murray, in 2012-2013, he decided to observe her counseling sessions because he felt more confident about his knowledge of her work.[33] He testified that he held a pre-observation conference on October 19, 2012, that Murray attended. However, he testified, she did not bring with her the requested pre-observation worksheet, the lesson plans or the activity sheets.

By letter dated December 20, 2012, Principal Mercedes informed Murray that effective January 4, 2013, she was going to be removed from room 316A because the room was reassigned for it to be used by the student government.[34] At the hearing, Principal Mercedes conceded that he removed her from her counseling room because she had not submitted any documentation to show that

---

[30] Tr. at 217
[31] Tr. at 214
[32] Tr. at 221-222 McKelvey did not testify
[33] Tr. at 259 and Tr. 263
[34] Department Exhibit 25

the students she was counseling were benefitting from her services.[35]  Murray was then reassigned to room 113 to share the room with other service providers and guidance counselors, including Matos, the Supervisor of School Aides, and Carr and Poe, the School's guidance counselors.

By letter dated December 21, 2012, Principal Mercedes directed Murray to terminate all of the mandated cases assigned to her effective Friday, January 4, 2013.[36] Thus, her entire caseload of mandated services was terminated.  He further explained that "...the era of accountability, data and monitoring student progress has provided us with the opportunity to reorganize the services we offer to our students."[37]  At the hearing, Principal Mercedes explained that he made this decision because he had concluded that the services Murray was providing to the students were ineffective because she never presented any evidence to show the impact of her counseling services on the students. Principal Mercedes further explained that, according to him, counseling is ineffective if you are providing a one-to-one counseling to a student, which he described as the most severe "prescription", and after three years that same student is on a one-to-one counseling session, then, he maintained, "there is no progress." Thus, he testified that he determined that the students serviced by Murray were not moving through a "continuum" if they were receiving the same services for three years, which, he believes, show no progress. He did not define what the "continuum" should be.

The twenty-one cases of mandated services in Murray's caseload were reassigned to the two guidance counselors, Poe and Carr, and to Ceballos, the social worker.

After her mandated cases were terminated, Murray was assigned to provide non-mandated individual and group counseling services to students at-risk, to provide conflict resolution with student to student disputes, mediation, and parents related matters.  As a social worker, Principal Mercedes indicated, he believed Murray had the knowledge and experience to deal with these matters and to provide the non-mandated services assigned to her.  The non-mandated

---

[35] Tr. at 299
[36] Department Exhibit 26
[37] Department Exhibit 26

cases were to be referred to Murray by teachers and counselors or any other personnel.

On January 17, 2013, Principal Mercedes held a meeting to discuss the support that Ceballos was providing to Murray.  Ceballos attended the meeting. During the meeting, Principal Mercedes testified, Murray indicated that she did not know what "crisis" means. This, he indicated, he found hard to believe because, "That's social work 101."

During the meeting with Ceballos, Principal Mercedes testified he presented Murray with a professional development plan to develop an outlined of a "3-tier level of professional development support." Principal Mercedes explained that the action plan consisted of: (1) professional development provided in house by licensed social workers, including Ceballos, Poe, and Carr. Principal Mercedes testified that the counselors also provided Murray with a "second Step/Respect" consolidated plan; (2) visits to other schools to talk to other social workers; and (3) professional development provided by the School's network.  Mercedes testified that Rebecca Dewey, from the School's network, also provided literature that was shared with Murray.[38]

On January 23, 2013, at 9:00 a.m., Principal Mercedes testified, Murray was scheduled to visit the Science and Medicine School as part of the remedial measures that he had taken to help her. Principal Mercedes testified she was given a feedback form and was asked to complete it with her observations during her visit to this school.   Although she completed the feedback form, as requested, Mercedes testified that the Principal from the Science and Medicine school reported to him that Murray arrived late for her visit and testified that when he, Mercedes, spoke to her about her visit, she characterized it as "a waste of time."

The Incomplete IEPS

By letter dated January 7, 2013, Principal Mercedes memorialized a meeting he held with Murray and her Union representative to discuss certain IEPs that were not in compliance. In his letter, Principal Mercedes stated that the IEPs of two students of Darrell McKnight ("McKnight"), a special education teacher, were not in compliance and had not been finalized to mainstream the

---

[38] Department Exhibits 31 and 31. See also Hearing Officer Exhibit 1

students because the IEPs were missing certain information that Murray had not submitted as requested.[39] At the hearing, Principal Mercedes explained that McKnight was trying to "mainstream" certain special education students. However, he was unable to "mainstream" the students because the IEP section that Murray needed to complete had not been completed by her.  Thus, he explained, because of her failure to complete her part, the IEPs were not in compliance.  Principal Mercedes further testified that Murray told him, in her defense, that she had not received the information from McKnight, which she needed to complete the IEPs. However, Principal Mercedes also testified that McKnight informed him that he had provided Murray with the counseling goals that she had requested from him.

The Department presented AP Lopez, who testified that she was informed directly by McKnight, the teacher, and by Dr. Friedmutter, the psychologist in charge of the IEPs' compliance, that they were waiting for Murray to submit the goals to complete the IEPs since the beginning of December 2012, Also, AP Lopez submitted a log reflecting the times she met with Murray and the issues that she discussed, including her failure to complete the goals for the IEPs in a timely manner. She testified that at some point, Murray informed her that she was having trouble logging onto SESIS.

The Bio-Psychosocial Reports, the Case Studies, Binders  and Weekly Reports

By letter dated January 30, 2013,[40] Principal Mercedes memorialized a meeting held with Murray, Ceballos, and him, to discuss her responsibilities as a social worker and requesting a list of her "targeted students" and the attendance logs and evidence of "targeted strategies." In his letter, Principal Mercedes also requested by February 4, 2013, for Murray to select five students and to develop bio-psychosocial reports ("bio-psychosocials") of the five students. At the hearing, Principal Mercedes explained that he believed she should have been capable of completing the bio-psychosocials because the interns at the school were able to do up to ten bio-psychosocial reports.

With regard to the bio-psychosocials, Mercedes testified that he assigned Ceballos on January 17, 2013, to work with Murray on the bio-psychosocials and

---

[39] Department Exhibit 28. See also Hearing Officer Exhibit 1, the Official Record for the March 25th Hearing.
[40] Department Exhibit 41

testified that they, Ceballos and Murray, were scheduled to meet on Thursdays for 45 minutes to discuss how to do bio-psychosocials. At the time, Murray was working with 6th and 7th grade students. He also indicated that Ceballos provided him with her log of assistance regarding the support provided to Murray; and a list of the students' attendance. Principal Mercedes also indicated that Murray never provided the list of students or their attendance records. He also testified that Murray provided the requested bio-psychosocials that were due on February 4, 2013. However, by letter dated February 8, 2013, Principal Mercedes informed Murray that two of the five bio-psychosocial reports that she submitted were unsatisfactory because the information contained in two of the psychosocials was taken directly from the IEPs records contained in the SESIS system. [41]

On February 28, 2013, Principal Mercedes met with Murray and Ceballos to discuss the support Ceballos was providing to her and to inform Murray that she no longer needed to provide the bio-psychosocial. Instead, he testified, she was then asked to submit ten case studies from students in the seventh grade. Principal Mercedes memorialized the meeting in a letter dated March 1, 2013.[42] Principal Mercedes testified that he asked Murray for the case studies because he learned from the interns in the School the importance of case studies in providing counseling services.  Mercedes did not know if Murray had previously completed other case studies before his request. The selection of the students for the case studies was "at the discretion of Murray" from students that she was already counseling.[43]

Thereafter, by email, Murray raised the concern that she was asked to complete the case studies in only 8 periods when it was a task she had never performed.[44] Both Ceballos and Principal Mercedes replied to her email and explained how to prepare the case studies.[45]

Principal Mercedes testified that Murray failed to submit the case studies in the manner that he requested.[46] Principal Mercedes indicated that when he

---

[41] Department Exhibit 42, 42A and Hearing Officer Exhibit 1
[42] Department Exhibit 47
[43] Department Exhibit 48(a)
[44] Department Exhibit 48(a)
[45] Department Exhibit 48(a)
[46] Department Exhibit 52

asked Murray for the case studies, she responded that she was having "time management problems."  Principal Mercedes testified that he directed Murray to meet with Carr and Poe to address her "time management issues."  He testified that he held a meeting with Murray and her Union representative on April 15, 2013, to discuss her failure to submit the case studies with the requested information. Principal Mercedes also explained that in completing the case studies, Murray needed to follow the manual and the "Inquiry Approach." Principal Mercedes also testified that certain information in the case studies was missing, such as students' weaknesses and reading scores. [47]In sum, Principal Mercedes testified that the information that "would make it a case study" was missing. Thus, according to him, what she submitted was insufficient.

With respect to the case studies request, Principal Mercedes also issued a letter dated April 30, 2013, to Murray, regarding her failure to submit the requested case studies and her failure to submit a list of activities that was requested on April 26, 2013.[48]  Principal Mercedes testified that Murray told him that she had not submitted them because she had difficulty preparing and printing the case studies.  He also testified that Murray gave him a list of activities by emails that described the four activities that Murray was working on.[49] Principal Mercedes also testified that he requested the list of activities because he was still trying to ascertain "what she was doing."[50] By letter dated May 10, 2013, Principal Mercedes acknowledged receipt of the case studies. The letter also states that she had not submitted the bio-psychosocial reports or the other evidence requested to show the impact of her services on the students assigned to he.

With regard to the requested binders, Principal Mercedes clarified that there was no request for binders during the 2010-2011 and 2011-2012 school years, because Murray was doing mandated services. During the 2012-2013 school year, when the binders were requested, he testified, Murray initially refused to provide the binders.  He also testified that he requested for Murray to

---

[47] Department Exhibits 50, 51 and 52
[48] Department Exhibit 56, 56A and Hearing Officer Exhibit 1
[49] Department Exhibit 56A
[50] Hearing Officer Exhibit 1

submit her case logs by letter dated March 19, 2013.[51] Principal Mercedes testified that Murray never submitted the logs.

By letter dated May 26, 2013, Principal Mercedes informed Murray that she did not follow instructions for the submission of the students' binders because they did not contain most of the information and records that were supposed to be in the binders. Principal Mercedes explained that he needed to see the records that were supposed to be in the binders such as the actual work that she had done with the students throughout the school year.

The Department presented Ceballos, who testified as follows: She has been employed by the Department as a social worker for about fifteen years, and has worked at the School since 2001.  She has a Masters degree in social work from Fordham University and is a Licensed Clinical Social Worker ("LCSW"). Her responsibilities include providing at-risk counseling to students.

Ceballos testified that the only difference between mandated and non-mandated counseling is that service providers of mandated individual and group counseling, she explained, are required to document their services to the special education students in the SESIS system.  She also explained that guidance counselors are not licensed to provide clinical services such as psychotherapy. However, she clarified, guidance counselors do provide individual and group counseling to the students. She also testified that service providers, such as the guidance counselors, conduct lessons in bullying prevention and respect for all.

On January 16, 2012, Ceballos began to assist and support Murray. Ceballos testified that she kept a log of assistance to memorialize the dates that she met with Murray and the matters that they discussed.[52] During their meetings, Ceballos testified, they discussed, in part, counseling protocols and guidance lessons, which included a review of the Second Step Curriculum. Ceballos explained that the Second Step curriculum is a curriculum to promote emotional and social development in students and that the curriculum used by teachers and service providers.  With regard to the Second Step curriculum, Ceballos testified that she gave Murray a copy of the Second Step Manual, and explained that by just reading it a provider should be able to follow the manual

---

[51] Department Exhibit 53
[52] Department Exhibits 62, 63

14

and conduct the lesson.[53] She also provided Murray with the Response To Intervention Manual ("RTI"), a manual related to interventions and support for students, to assist her with completing the case studies that were assigned to her.[54] She described a case study as a representation about a student, which includes information about the student's life, academic and social and emotional performance and about the needs and strengths of the students. She explained that as part of their academic preparation as social workers, a social worker should be able to prepare a case study. The student data can be obtained, she noted, from interviews with the teachers and from the records available at the School.[55] She also pointed out that it is not necessary to interview a student to prepare a case study and that consent of the parents is not necessary to prepare a case study.[56]

According to Ceballos, a bio-psychosocial includes information about the students' strength and weaknesses, challenges, prognosis and diagnosis, and family history. She testified that the purpose of the bio-psychosocial is to formulate a mental health assessment of the student.[57] She clarified that for a bio-psychosocial, the parent's consent is required.[58] She testified that service providers are responsible for having a binder with the students' records, including attendance records, interventions, and records of all services provided to the student. Binders, she testified, have always been required for as long as she remembered.

In her defense, Murray testified as follows: Until December 2012, as Related Service Provider, she provided mandated individual and group counseling, when she was mainly responsible for implementing the interventions outlined on a students' IEP. She further explained that the IEP outlines the goals and describes the specific work that needs to be provided to the students.  As part of her responsibilities as a mandated service provider, she testified, she was required to complete counseling updates, complete annual reviews and participate in Educational Planning Conferences ("EPC"). With regard to the

---

[53] Department Exhibit 65 and Tr. at 511
[54] Department Exhibit 66 and Tr. at 511-512
[55] Tr. at 516
[56] Tr. at 519
[57] Tr. at 521-522
[58] Tr. at 522

IEPs, Murray described how the School Based Support Team ("SBST"), which is a team that determines whether a student qualifies for special education services, conducts an assessment of the students every three years. During the year that assessments are conducted, she was required to conduct an annual review. According to Murray, the "counseling updates" were done annually.[59]

Murray consistently maintained that a Related Service Provider does not teach any classes or deliver any instructional lessons.[60] She testified that she spends about 35 periods a week providing counseling, which, according to her, is most of the entire week. The remainder of the week was spent, she indicated, doing paperwork and other indirect services. She noted that a Related Service Provider does not need to be a social worker. According to her, a guidance counselor, a psychologist or a licensed social worker can provide the counseling services provided by the Related Service Providers. The main difference, she pointed out, between Related Service Provider and the licensed social worker is that the social worker works on the assessments created by the SBST. Murray testified that she has never been a member of the SBST.

Murray testified that when she provided mandated services to students with IEPs, the SBST outlined the goals related to the mandated counseling services provided to the students, and it determined how often she needed to see the student with IEPs.  According to her, the SBST asked her to provide progress reports between the tri-annual assessments. If information was needed, before the tri-annual review, the SBST could check the SESIS system to review the students' records.  She maintained that before Principal Mercedes was assigned to supervise her, she took no part in creating the goals for the students' with IEPs. Murray testified that a Related Service Provider, such as her, needs to prepare a progress report for each of the goals contained in the student's IEPs.[61]

Murray indicated that the School also has a crisis intervention team. During the 2010-2011 school year, the crisis team consisted of two social workers, Fred Buchannan, her former supervisor, Ceballos, and McKelvey, a special education teacher who retired. She testified that she was never part of the crisis intervention team.

---

[59] Tr. at 825-828
[60] Tr. at 829
[61] Tr. at 834-835

Prior to the 2010-2011 school year, Murray testified, she had never received an unsatisfactory rating.[62] In reviewing her unsatisfactory rating for the 2010-2011, Murray maintained that most of the categories are inapplicable to the work that she performed that year.[63] She indicated that she should have been evaluated with the annual performance form for the SBST, as it was done in previous years before Principal Mercedes was assigned to supervise her.[64] Murray indicated that in prior years, when Principal Mercedes rated her satisfactory, when she had an in-discipline social worker as her supervisor, he used the proper form for rating her.[65]    Murray further testified that during the 2010-2011 school year, Principal Mercedes never explained to her how he was going to evaluate her and he never observed her during a counseling session.[66] She testified that in previous years, she also received feedback about her performance after she was formally observed. During the 2010-2011 school year, she pointed out, the first time Principal Mercedes discussed her performance with her was when he sent his letters dated May 10, 2011.[67] Murray testified that in response to Principal Mercedes' request for information at the end of the 2010-2011 school year, she submitted counseling attendance records, the IEPs that contained all information about the goals for the counseling, the frequency of her counseling sessions, her progress reports, and other information about the activities she was conducting with students.[68] Thus, she believes that she complied with the request.

During the 2011-2012 school year, Murray testified as follows: she provided mandated services for about 45 to 50 students with IEPs.  She had access to SESIS, the electronic record system for students with special needs, where the progress reports, attendance records and updates are maintained.[69] She received some limited training on how to use SESIS and claimed that the system was excessively slow and that she did not have a full grasp on how to use the system because she was never trained on how to use it.

---

[62] Tr. at 836
[63] Murray appealed all of the unsatisfactory ratings given
[64] Respondent Exhibit 2
[65] Tr. at 845 and Respondent Exhibit 2
[66] Tr. at 849-850
[67] Tr. at 863 and Department Exhibit 2
[68] Respondent 4, 4A, 4B, Department Exhibit 7 and Tr. at 870
[69] Tr. at 876

Murray testified that when Principal Mercedes directed her to make ten periods available to provide non-mandated counseling,[70] she was only available for seven periods. She also indicated that she had never been asked to prepare lesson plans for the kind of services that she provided, and that in 2011-2012, when he asked for the students' IEPs, she was late because she did not know what he needed. She explained that the previous year, she provided him with the IEPs w that contained the students' goals and with the progress reports. However, she noted, he told her that the documentation was insufficient. Thus, she was not certain, for all the requests that followed, what type of documentation he was requesting from her.

She claimed that Principal Mercedes gave her a date for the meeting but not a time and thus, she did not attend the meeting on June 13th.[71] After she submitted the IEPs, Murray testified, Principal Mercedes never gave her feedback or explained what he wanted her to produce. She conceded that she never asked him to clarify his request.[72]

With regard to the IEPs without "first attend dates," a complaint made by McKelvey,[73] Murray testified that she met with McKelvey various times and did not know what 20 students Principal Mercedes was referring to in his letter. In this regard, Murray submitted an email she sent to Principal Mercedes asking him to provide her with a list of the 20 students and, she testified, that he never submitted the list to her or identified the 20 students.[74] Murray also claimed that she sent an email to Principal Mercedes because she was having problems logging into SESIS and that impeded her ability to make the "First attends dates." She testified that she called the help desk, as suggested by Mercedes in his emails, but that it did not resolve the problem.[75]

With regard to the IEPs of McKnight's students, Murray testified that she learned about it when she received Principal Mercedes' letter because McKnight never told her anything about it and further testified, "No one ever told

---

[70] Department Exhibit 9 and Tr. at 878
[71] Tr. at 880
[72] Tr. at 884
[73] Department Exhibit 18
[74] Respondent Exhibit 5 and Tr. at 884-885
[75] Tr. at 984

me that there was a re-evaluation that I needed to evaluate." [76] Her understanding, she explained, was that she needed to complete some of the paperwork for the mandated cases that were terminated. Murray testified that she had done the paperwork but that it was handwritten and not in SESIS because she had no computer. She maintained that the two IEPs mentioned in Principal Mercedes' letter were completed. [77]

With regard to the pre-observation conference that she attended on October 19, 2012 with Principal Mercedes, for which she received a letter because she came unprepared, Murray denied that she was informed about the need to bring lesson plans or an activity sheets to the pre-observation.[78] Murray testified that she wrote an email to Principal Mercedes to let him know that the short time allotted for the pre-observation conference was insufficient to assist her, and that she needed to understand how to use the Danielson Rubric in counseling of her students.[79] She testified that she was not familiar with the Danielson Rubric and never received training on how to utilize it. [80] Murray also testified that Principal Mercedes never clarified to her how the Danielson Rubric applied to her work as Related Service Provider.[81]  She explained she had never completed a worksheet and the other requested documentation because she was not a teacher. Murray also testified that Principal Mercedes conducted an observation of one of her counseling sessions but, she claimed that he never gave her any feedback or any written report.

With regard to her visit to the School of Medicine and Science, Murray denied that she arrived late. She testified she spent the day with a guidance counselor, who did not mention anything about the Second Step curriculum. She talked to her about how to use SESIS and about Related Services.

With regard to the bio-psychosocial reports, and Ceballos' assistance, Murray testified that she believed the term bio-psychosocial was used in a clinical setting like a hospital. She testified that Principal Mercedes instructed her not to interview students. Thus, she explained, the only thing she could do was to use

---

[76] Tr. at 909
[77] Tr. at 910-911
[78] Department Exhibit 21 and Tr. at 890
[79] Respondent Exhibit 10
[80] Respondent Exhibit 12 and Tr. at 996
[81] Tr. at 990 and 991

the information contained in SESIS. She maintained that she did not know what she was doing because a bio-psychosocial need to have a purpose, and the ones requested had no purpose. For this reason, she did not know how to do the assessment. Thus, she testified, she simply gathered as much information as she was able to.

Murray conceded that Ceballos assisted her with understanding the Second Step manual. However, with regard to her assistance, she testified that she did not remember what they discussed and that, "It was never anything that would help" because she simply told her to read the Second Step Manual.[82] She testified that she used the Response Intervention Manual ("RIT") about four times but that she never received the manual for sixth graders. She also testified that she did not find it helpful because it was teachers' focus.[83]

With regard to the request for her to select 10 students from the seventh grade to complete case studies for them, Murray testified that she sent her email on March 4, 2013,[84] to ask for help with the case study assignment because she was unfamiliar with the case study format. She also explained she did not feel comfortable researching students with whom she did not have a relationship and whose parents did not know what she was doing. Murray further explained Principal Mercedes referred her to Ceballos, who according to Murray, did not provide the information she was seeking. Murray indicated that she did complete some of the requested case studies.

Murray maintained that at the time she was not given sufficient time to complete the assignments and was on constant threat of an unsatisfactory rating.[85]

As for the action plan put in place to assist her,[86] Murray testified that it was not applicable to social workers or the work that she did as a Related Service Provider, and suggested that most of the information was already in the SESIS system.[87]

---

[82] Tr. at 958
[83] Tr. at 960 and Department Exhibit 60
[84] Department Exhibit 48A
[85] Respondent Exhibit 17 and Tr. at 1011
[86] Department Exhibit 17
[87] Tr. at 885

**The Parties' Position Regarding the Alleged Failure to complete and/or Submit the Requested Documentation and Charges of Incompetence and Unprofessional Conduct**

The Department asserts that it met its burden of proof to establish each one of the Specifications by the preponderance of the credible record evidence. It argued that the documentary evidence it presented and the credible testimony of its witnesses, who the Department described as qualified administrators and service providers with extensive work experience, is sufficient to establish just cause exists for disciplinary action.   The Department also argued that Respondent is not a credible witness and that she failed to understand and value her responsibilities as a service provider.

The Department contends the credible record demonstrates that Respondent lacks the capacity to perform her duties in a competent and professional manner.  It argued that her continued neglect of the duties assigned to her and her unprofessional conduct as well as her continued failure to follow the directives of Principal Mercedes, is sufficient to terminate her employment. The neglect of her duties is evidenced, the Department posits, by her continued failure to maintain accurate records of the services that she was assigned to provide to her students; her inability to complete her work assignments as instructed; and her failure to maintain professional relationships with her colleagues. Furthermore, the Department contends, her continued failure and/or refusal to comply with her supervisors' directives constitutes insubordination.

With respect to the claim that Principal Mercedes was not qualified to evaluate Respondent, the Department argued that Respondent did not raise any issues about his qualifications when he rated her satisfactory prior to 2010.  The Department maintains that Principal Mercedes' lack of educational background or work experience evaluating social workers and/or Related Service Providers only became an issue when he rated her unsatisfactory.  Similarly, the Department points out that Respondent never raised any issues about the failure of the administration to observe her work, when she was rated satisfactory, during previous years that are not alleged in the Specifications.  It also argued that it was the Department's decision to assign Principal Mercedes to evaluate Respondent and thus, he had no choice in this matter. Given these circumstances, the Department contends, Respondent's claim that her

21

unsatisfactory ratings should be invalidated is without merit and should not be given any weight.   Furthermore, the Department contends that the issue of whether Principal Mercedes was qualified to evaluate Respondent should be addressed in a different forum such as, the contractual grievance procedures, collective bargaining negotiations, or in the courts. The sole issue in this case, the Department asserts, is whether Respondent followed the directives given by her supervisors.

The Department also maintains that Principal Mercedes credibly testified that when he was assigned to evaluate Respondent's work, he took affirmative steps to learn what Related Service Providers and social workers do, including training and seeking the Department's support of the administration to learn how to evaluate Respondent.  The training and support he received, the Department argued, allowed Principal Mercedes to become familiar with Respondent's work and the work of social workers.  According to the Department, the training and support Principal Mercedes received enable him to determine that Respondent had failed to demonstrate the impact of the services that she was provided to the students assigned to her during the period alleged in the Specifications.

As for the claim that Respondent was not a teacher, the Department argued that Principal Mercedes credibly testified that the role of a teacher and a social worker or the role of a Related Service Provider, such as Respondent, are the same to the extent that they both guide students in attaining their social and emotional goals, which are directly related to the students' academic success. The Department reasons that the students are better able to perform academically when they can cope with their social and emotional stressors. Therefore, according to the Department, Respondent should have been able to "guide" or instruct her students to help them improve their social and emotional skills even though she was not a teacher.[88] It also points out that Ceballos and Poe both corroborated that the role of a service provider is similar to the role of a teacher because they both "teach" students and notes that Poe described how she includes mini-lessons and modeling as part of the services that she provides to her students. In the case of the social service providers, the Department indicated, the lessons are about bullying preventions, respect for all, and social

---

[88] Tr. at 1133

skills. The Department also argued that Principal Mercedes credibly testified that he did not use the Danielson Rubric to evaluate Respondent. Rather, according to the Department, Principal Mercedes' testimony shows that he only used certain components of the Danielson Rubric that are applicable to the work performed by Respondent and other service providers.

The Department asserts that Principal Mercedes credibly testified that the removal of Respondent's mandated services case loads during the 2012-2013 school year was necessary to support his vision for the type of services that he wanted to provide for his students. The Department also asserts that Principal Mercedes credibly testified that he never assigned any of these service providers, including Respondent, duties that were outside of the scope of the services that they were required to provide to the students. Based on her years of experience as a service provider as well as her educational background, the Department argued, Principal Mercedes honestly believed that Respondent was fully capable of performing the non-mandated duties assigned to her after January 2013. Unfortunately, the Department argued, Respondent demonstrated she lacks the capacity to perform any of the duties assigned to her.

Furthermore, with regard to the removal of Respondent's duties, the Department asserts that there is no credible record evidence to support the suggestion or the claim that her removal was retaliatory or was wrongfully motivated. In this respect, the Department further maintains that AP Lopez credibly testified that in or about August 2012, about three months before Respondent filed her complaint with the UFT, Principal Mercedes had informed her that he wanted to make some changes in the manner that services were provided to the students, and that he mentioned the creation of a student support team. Furthermore, during the time in question, the Department indicates, Ceballos and Poe were also assigned new duties in 2012-2013, to provide mandated services, and began to perform their duties without any new training. The Department argued that in contrast with Respondent, both Ceballos and Poe drew on their prior experience and other resources that they obtained on their own, to perform the new duties assigned to them.

The Department also contends that there is no significant difference between the mandated services to students at-risk provided by Respondent prior

to January 2013, and the non-mandated services assigned to Respondent in January 2013, filed her complaint with the UFT. The Department argued that Ceballos and Poe credibly testified that the duties of the service providers such as the social workers, guidance counselors, and Related Service Providers are inter-related and their goals are the same: to ensure the social and emotional well-being of the students. The Department also indicates that Ceballos and Poe explained how the only difference between the providers of mandated and non-mandated services relates to the IEPs required for providers of mandated services. Otherwise, the Department claims, the duties of a provider of mandated services and the provider of non-mandated service involve the same set of skills and are essentially the same. For these reasons, the Department insists that it was Respondent who made the transition to her newly assigned non-mandated duties unnecessarily difficult to handle.

In this case, according to the Department, the credible record clearly shows that she failed and/or refused to follow the supervisory directives given to her, as they are alleged in the Specifications. Furthermore, the Department argued, the documentary evidence submitted by the Department in support of each Specification show, in great detail, how the administration let Respondent know that the documentation she had submitted was insufficient to satisfy her supervisors' requests for documentation about her work. Essentially, according to the Department, the documentation submitted by Respondent did not show what kind of work she was actually doing with her students.

As for the specific categories of information and documents, the Department argued as follows: Knight, the special education teacher, credibly testified that he was unable to complete the IEPs of two students on Respondent's caseload to mainstream the students due to Murray's failure to submit the requested documentation, and indicates that Respondent admitted that she needed to submit the documentation to Knight.[89] Instead of submitting the IEPs in a timely manner, the Department argued, she made lots of excuses. The Department also maintains that AP Lopez credibly testified that on December 20, 2012 she also reminded Respondent that Knight needed her counseling goals to complete the IEPSs.

---

[89] See Tr. At 908

With regard to the bio-psychosocial reports, the Department argued, she should have known how to complete them even if she had not done this task before because it was well within the realm of her duties as a social worker and Related Service Provider. In this regard, the Department indicates that even the social work interns were completing the bio-psychosocial reports as part of their educational work.  It also notes that both Poe and Ceballos were completing them and that Ceballos testified that she assisted Murray in completing the bio-psychosocial reports.  Despite her assistance, the Department argued, Murray failed to complete the bio-psychosocials.. If she was properly servicing students, the Department posits, she should have been able to complete the bio-psychosocial reports. There is no record evidence to indicate that the directive was improper or that she lacked the ability to complete them. Thus, this Specification, the Department contends, should be sustained.

With regard to the case studies, which she failed to complete in the manner that was requested, the Department argued, that Murray also received assistance to complete them. It argued that Poe and Carr credibly testified that they met with Respondent to review the components required for a case study and provided her with a template form to complete them.  Instead of completing the case studies, the Department argued, she made the same excuses that she did not understand the request and/or did not know which students to work with. In this regard, the Department maintains that for the case studies. Murray could have used the seventh grade students assigned to her during the 2012-2013 school year, and argued that if Murray had documented her sessions with them, she could have used the information for the requested case studies. Her failure, the Department argued, was not only due to her unprofessional conduct and the neglect of her duties.

With regard to the request for the binders, the Department argued it was "a last ditch effort" by Principal Mercedes to obtain some kind of evidence that would show the type of work that she was doing during the 2012-2013 school year.[90]  At the time of this request, the Department indicates, it was April 2013, only two months before the end of the school year, and Respondent had not completed the case studies or the bio-psychosocials. The Department argued

---

[90] Tr. at 1142

that Principal Mercedes credibly testified that he explained to Respondent the type of work that should be contained in the binders.  Nonetheless, the only information or records that she submitted was a list of four activities that she had been doing with students.  Thud. Department contends, she also failed to comply with the request related to the binders.

The Department points out that Principal Mercedes praised her for the work that she was doing related to the four activities that she was doing because, according to the Department, Principal Mercedes still wanted to work with her. The Department argued that if Mercedes was retaliating against Respondent, as she claimed, he would not have praised her work.

For these reasons, the Department contends that it established all of the Specifications related to her failure to complete and/or submit the requested information and documents alleged in the charges.  Such failure and unprofessional conduct, the Department contends, constitutes insubordination, neglect of duties and conduct unbecoming of her profession.

The Department further contends that she cannot be remediated. In so doing, the Department relies on the action plan put in place to assist Murray and on the assistance provided to her, including the assistance provided by Dr. Friedmutter and Ceballos.  Accordingly, the Department contends, remedial measures were taken to assist Respondent with her professional deficiencies. The Department also argued Respondent was also clearly put on notice that her failure to improve her unprofessional conduct, the neglect of duties, and insubordinate conduct, may result in the termination of her employment.

On the other hand, Respondent asserts that the Department failed to demonstrate that Murray is unprofessional, incompetent or that she is unable to further the social educational development of the students assigned to her for counseling or that Respondent failed to implement recommendations given by the School's administration to improve her deficiencies. Accordingly, Respondent contends, the Department failed to establish just cause exists to terminate her.

Prior to this case, Respondent also points out, her performance as a Related Service Provider was rated satisfactory before the school year 2010-2011, when Principal Mercedes rated her annual performance unsatisfactory. In this respect, Respondent notes that Principal Mercedes admitted that prior to

2010-2011school year, he had never supervised a Related Service Provider or a social worker and admitted he has no formal education or certification in the social work field.   Therefore, Respondent contends, Principal Mercedes was unqualified to evaluate Murray and had no idea how to evaluate her performance. Respondent argued that he admittedly used an improper standard to evaluate her during the annual performance evaluations at issue. In this regard, Respondent also argued that Principal Mercedes maintained during his testimony that he did not need any justification for his unsatisfactory annual performance ratings. For these reasons, Respondent contends, the evaluation process conducted by Principal Mercedes was fatally flawed.   Accordingly, Respondent asks that I do not consider the unsatisfactory ratings as the basis to support any disciplinary charges against Respondent.

Respondent maintains that the Department failed to demonstrate why Murray's performance was rated unsatisfactory during the years alleged in the Specifications.   In this respect, Respondent argued that there is no record evidence to show that any supervisor or administrator observed Murray's performance as she counseled or worked with students assigned to her. Respondent also argued that during the 2010-2011 school year, Principal Mercedes rated her unsatisfactory for failure to submit requested documentation even though she had submitted the documents.   Respondent also argued, with regard to other requested documentation, that Principal Mercedes also admitted during cross-examination that he never specified the nature of the documents he had requested from her.   Respondent also points out that during his testimony, Principal Mercedes was not able to answer why the various forms of documentation that Murray submitted during the years alleged in the Specifications was insufficient to satisfy his request.

Respondent also indicates that Murray submitted the students' schedules to show the times when she met with the students assigned to her and completed various bio-psycho-social reports that showed her targeted intervention.  Respondent also maintains that she credibly testified that Principal Mercedes told her not to interview any students for the bio-psychosocial reports. Since she was not able to interview her students, Respondent maintains, her

only option was to gather the requested information from other records available in SESIS.

With regard to the alleged failure to complete and submit the activity sheets, objective and pre-observation worksheet, In her defense, Respondent argued that she was not required to have a pre-observation conference because she is not a teacher.  She also indicates that the record evidence demonstrates that no formal observation of Respondent was ever conducted.   Respondent asserts that the only time that Principal Mercedes observed Murray was during an informal observation instead of the formal observation. Furthermore, the alleged worksheet that she failed to complete, Respondent argued, relates to the Danielson Rubric designed for teachers not for Related Service Providers. Despite these circumstances, Respondent argued, Murray credibly testified she completed and submitted the requested worksheet except for the sections that were intended to be completed by teachers.

Respondent also maintains that at the time that Principal Mercedes asked Murray to select ten students from her seventh grade caseloads, she did not have any caseload.  In addition, Respondent argued that she credibly testified that asks Principal Mercedes via email to clarify his directive.   At the time, Respondent notes that Principal Mercedes referred her to AP Lopez to help her. Respondent further argued that Murray credibly testified that neither AP Lopez nor anyone else help her to complete the task.  Despite the lack of support or clarification related to this directive, Respondent argued, Principal Mercedes rated the case studies that she submitted unsatisfactory.   Respondent also maintains that the Department failed to establish why her case studies were unsatisfactory.

With regard to the binder, Respondent argued that Principal Mercedes did not instruct Murray to submit the binder until towards the end of the School year on May 1, 2013, without affording her a reasonable time to complete it. Respondent also indicates that the letter instructing her to complete the binder did not contain any specific date line for the submission of the binder and/or did not specify what she was expected to do to complete the binder. Given these circumstances, Respondent asks for these allegations should be dismissed.

With regard to the IEPs, Respondent argued that Murray credibly testified that the requested counseling data was submitted.  She maintains that initially, when she attempted to obtain the data from the SESIS data system, she was unable to access SESIS.  She argued that Principal Mercedes was aware of the problems that she encountered when she initially tried to access SESIS. For these reasons, Respondent asks for this allegation to be dismissed.

As for the action plan put in place to improve her performance, Respondent argued that, on its face, it shows how the administration failed to provide her with any real remediation and/or professional development relevant to her work as a Related Service Provider.  Respondent argued that the action plan contains items that "blatantly do not apply" to her.  Specifically, Respondent indicates that the demonstration lessons and the collection of lesson plans are for teachers and clearly did not apply to Murray as a non-teacher.  The action plan, she notes, also requested inter-visitation to classes that were never arranged by the administration. In so doing, Respondent argued that during his testimony Principal Mercedes, at times, appeared confused as to whether Respondent was functioning as a social worker, guidance counselor or as a teacher. Respondent points out that she has never held a position as a teacher and that during the last twenty years she has always worked as a Related Service Provider.  Furthermore, Respondent argued that although Principal Mercedes testified that she did not meet the goals outlined in the action plan, when questioned during cross-examination, Principal Mercedes admitted that there are no goals set forth in the action plan provided to her. Lastly, as for the action plan, Respondent argued that the action plan never specified how it would help Respondent improve her performance as a Related Service Provider. Accordingly, Respondent posits that the Department failed to provide her with any appropriate professional development and/or the support that she needed to address the deficiencies alleged in the Specifications.

In addition, Respondent claims that the timing of some of the unsatisfactory ratings issued by Principal Mercedes were wrongfully motivated and were not based on her performance as a Related Service Provider.  In this regard, Respondent indicates that in December 2012 and January 2013, Murray filed a complaint with the United Federation of Teachers ("UFT"), related to the

removal of special education services to certain students at the School. Immediately after her complaint, Respondent notes, Principal Murray terminated her entire case load, moved her from her own counseling room to a share room 113 with other colleagues, and was assigned job duties that she had never performed before.   Furthermore, Respondent argued, Principal Mercedes acknowledged that when he wrote the letter terminating her caseload, which was done the same day that the complaint was filed, he was aware that she had filed the complaint. In January 2013, after the filing of the complaint, Respondent indicates, Principal Mercedes completely changed her job responsibilities to an out of license position as guidance counselor and effectively removed her from her appointed position. Respondent also noted that the guidance counselor and the Related Service Provider positions are covered by different collective bargaining agreement and have different roles in the School.  Given the timing of these events, Respondent contends, the evidence is sufficient to establish that Principal Mercedes retaliated against her because she filed a complaint in the best interest of her students.  Respondent also contends that Principal Mercedes is not a credible witness and argued that is answers were often responsive and were evasive.

In sum, Respondent posits that she is a competent Related Service Provider who was rated satisfactory for 20 years before an admittedly unqualified principal was assigned to supervise her and to evaluate her performance.

**FINDINGS**: **Specifications 2, 3, 5, 7, 9,10, 11, 12, 13, 14, 17, 22, and 25**

After a careful review of the entire record, I find all of the witnesses presented by the Department are credible witnesses.  As such, I credit their testimony in their entirety.  As for Principal Mercedes, I find his testimony was candid and I find that he presented his honest account of the events alleged in the Specifications. I considered that he made no attempts to bolster the Department's case. I note that he did not hesitate to admit the fact that before he was assigned to supervise Murray, he had no previous experience evaluating the performance of social workers, and conceded that he had to seek guidance and support to learn how to evaluate Murray's performance.  Further, I considered that his testimony is also supported by the detailed information contained in the

30

numerous letters he issued to Murray. In this regard, I considered that the letters were written contemporaneously to the events described in the letters. Also, the various credible witnesses presented by the Department who testified about their working relationship with Murray and other work related matters serve to corroborate his testimony. There is no record evidence to show that they had a reason to lie about the events alleged in the Specifications.  I also find that the evidence is insufficient to establish that Principal Mercedes' evaluations or disciplinary actions were tainted by animus or hostility because Murray filed a complaint with the UFT.  On this record, the timing of the events, without more, is not sufficient to establish Murray's claim of retaliation.

I also find the testimony of Ceballos, as a licensed social worker with many years of work experience in the social work field, to be not only credible but also competent and reliable.  Both Ceballos and Dr. Friedmutter provided credible information about the nature of Murray's work.  Both of them credibly testified how difficult it was to assist or to work with Murray when they were assigned to do so.

In contrast, I did not credit Murray's testimony unless corroborated by some other credible, competent, and/or reliable record evidence.  Her credibility was shattered when she described her communications with Vance, the SCI investigator[91] and when she denied knowing or authorizing Spiegel, who at the time was her own attorney in an unrelated matter, to contact Vance to inform him that she was not going to cooperate with the investigation and when she insisted that she did not know anything about Spiegel informing Vance that she was not going to cooperate with his investigation. In so doing, I note, it is within Murray's rights to refuse to cooperate with this kind of investigation. If, indeed, she refused to cooperate, she was well within her rights to do so.  Therefore, with regard to her credibility, her refusal to cooperate with the investigation was not the issue. Rather, it was her account of what transpired that undermined her credibility. Specifically, it was her entire description of her interaction with Vance, the investigator that destroyed her credibility here.

---

[91] Murray's testimony related to her interaction with Vance is discussed below during the discussion and analysis of Specification 24.

First, Murray conceded that she initially told Vance that she would be happy to talk to him.  She also admitted that she had a telephone conversation with him while she was at her home on a day that she was out on sick leave. Still, she testified that she did not recall any of the details of that conversation except that Vance talked to her about where she lives and told her that his parents live nearby. In this context, Murray maintained that Vance did not ask her to cooperate with the investigation and that he did not inform her that the allegations were against her.  She never explained why Vance would call her at her home if she had no other relationship with him and he had no other reason to call her except for the fact that she was the subject of his investigation. I find this is simply not credible.

Secondly, with regard to Spiegel, Murray never explained, on this record, why attorney Spiegel, who was representing her in a different matter, would contact Vance on her behalf and then not tell her anything about it. I do not find credible that Spiegel contacted Vance without her knowledge or that Spiegel never discussed with her the conversation with Vance. I also note that Vance memorialized as part of his investigation the communication with her and with Spiegel. At the hearing, Vance also provided a detailed and credible account of his communications with Murray and with Spiegel.

Lastly, I considered that her testimony about her communication, or lack thereof, was not the only instance where her credibility came into question. In this regard, I considered that during her testimony there were numerous times when she initially testified that she did not recall anything about the events in question and then proceeded to provide a detailed account, with detailed quotes, about what was said during the interaction.  For these reasons, I find Murray did not credibly testify.

The question of whether Principal Mercedes used the proper standard or criteria to evaluate Murray's performance or whether he failed to adhere to the procedures contained in the collective bargaining agreement, are not issues before me.  However, when the Department seeks to use the unsatisfactory ratings to establish the allegations contained in the Specifications, as in this case, then the question of whether the unsatisfactory ratings were rationally based or whether the ratings were arbitrary needs to be considered to determine

if just cause for disciplinary action exists. Furthermore, in deciding whether just cause exists, it is also necessary, I believe, to determine if there were significant deficiencies in the review process that undermined the integrity and fairness of the performance evaluation.  In this case, for the reasons discussed below, I gave no evidentiary weight to the unsatisfactory ratings presented by the Department.

First, based on Principal Mercedes' testimony, this record shows that he rated Murray unsatisfactory during the three school years alleged in the Specifications because he concluded that Murray failed to demonstrate the impact of her counseling services on the students assigned to her. For example, In 2010-2011, without having ever observed Murray's performance and without having discussed her performance with her, at the end of the School year, he directed her to provide him with documentary evidence of the impact of her services on students "in lieu of an observation." Thereafter, when Murray provided him with the IEPs, attendance records, progress reports about her students, which related to the work that she was doing, he determined the submission was unsatisfactory because it did not show any evidence to demonstrate the students' growth.  Thus, he rated her unsatisfactory without conducting any observation or any substantive discussion about her performance with her before he concluded that her performance was unsatisfactory. This, I find, was completely arbitrary.

Also, on this record, there is no evidence to demonstrate that his insistence on obtaining evidence of her students' growth was rationally based.  A close review of Principal Mercedes' testimony shows that not even he knew how to measure the impact of Murray's counseling on her students or how she could demonstrate such impact.  In this regard, I also considered that, at some point during his testimony, he candidly admitted that all he wanted was "something written" even if it did not relate to her counseling services.

Furthermore, in this case, I find, there is no competent or reliable record to support Principal Mercedes' conclusion that counseling is the same as teaching, with no difference what so ever, because, as described by him, when you counsel you are "teaching" coping skills about how to survive.  In essence, his testimony shows his complete lack of understanding of the social work field

inasmuch as he reduced the entire field of social work to "chit chatting." His remarks that if a student is on one to one counseling for three years, which he described as the most severe "prescription", it means that there is simply no growth and no benefit from the counseling.  His lack of understanding, I find, affected the integrity and fairness of his evaluation of her performance, and, I believe, adversely affected his relationship with Murray. It is clear from this record, I believe, that after the 2010-2011 unsatisfactory evaluation, their working relationship simply went downhill. For these reasons, in this case, the unsatisfactory ratings were not considered as part of my just cause determination.

Nonetheless, Principal Mercedes' lack of understanding about the nature of her Murray's work or about the field of social work, I find, does not serve to excuse Murray's failure to submit and/or complete, as requested and in a timely manner, the bio-psychosocial reports alleged in Specification 10, the case studies alleged in Specifications 11, 12, 13, and 22, her failure to complete the binder alleged in Specification 14 and her failure to complete the IEPs alleged in Specification 17. In so doing, I considered that by the 2012-2013 school year, Principal Mercedes expanded the focus of his requests for documents and information from solely asking about the impact of her services on students, to also asking for documentation about the type of work that she was doing.  By the 2012-2013 school year, I find, the record shows that he was also attempting to determine whether she was capable of doing her work or whether she was actually doing her work. Such requests, I find, were rationally based and well within the scope of his supervisory authority.

Furthermore, during the 2012-2013 school year, a close review of Murray's testimony shows that she was in a constant "explain it to me" mode, wherein various service providers, including Ceballos, had to explain to her how to prepare a case study and/ or a bio-psychosocial report or the most basic aspects of her job.  For example, how to prepare a case study, Ceballos credibly testified, is part of the formal education of a social worker. Thus, considering her Masters Degree in Social Work from Columbia University, I do not find credible Murray's claim that she did not know how to prepare a case study or a bio-

psychosocial report.   For these reasons, I find the Department established Specifications 10, 11, 12, 13, 14, 17 and 22.

I dismissed all allegations in Specifications 2, 3, 5 and 7, because the request was either related to documentation and information provided during the 2010-2011 school year or because it related to the goals that were already contained in the students' IEPs that she provided or the request related to a pre-observation conference that was conducted as if Murray was a teacher. Similarly, Specification 25 is dismissed because a significant number of the recommendations given by Principal Mercedes, or directed by him, were based on his conclusion that there is no significant difference between the work of social workers and the work of teachers. His conclusion, I find, as discussed above, is not rationally based or supported by the competent and reliable record evidence.

**Specifications 4 and 15 alleging that Murray failed to attend a meeting with the Principal reflected in a letter dated June 15, 2012, and her failure failed to attend a professional support session with Dr. Friedmutter as reflected in a letter dated November 9, 2012, and, are discussed together to facilitate the discussion and analysis.**

Principal Mercedes also testified that Murray failed to attend a meeting with him to discuss her goals in counseling the students assigned to her.  He testified that she did not appear for the meeting even though he notified her in writing about the scheduled meeting.  Principal Mercedes also testified that Dr. Friedmutter informed him that Murray did not attend the scheduled meeting on October 30, 2012, with Dr. Friedmutter,[92]

The Department presented Dr. Friedmutter, the School psychologist, who testified as follows:  He has worked for the Department for about 25 years, and has been at the School for about eight years. On November 9, 2012,[93] Principal Mercedes asked him to assist Murray with carrying out her mandated services. He noted that Principal Mercedes did not indicate to him the specific areas where Murray needed assistance. Dr. Friedmutter submitted his log of assistance, wherein he memorialized the dates he met with Murray, beginning December 7, 2012, or when she failed to appear for the meeting and the subjects he

---

[92] Department Exhibits 22 and 23 and Tr. at 263-275
[93] Department Exhibit 69 and Tr. at 705

discussed with her.[94] Initially, the first date, Dr. Friedmutter explained that he asked Murray if she had any specific areas that she would like to discuss with him.  However, he indicated, she did not identify any areas of concern. Thus, he decided to assist her with creating goals and with how to provide counseling to her students. He noted that he was surprised that during the discussion about goals, Murray chose a student that she was not counseling.  He explained that he was surprised because the goals for counseling are very specific to each case.

In her defense, with regard to the meeting with Principal Mercedes, Murray testified that although she knew the date for the meeting ith Principal Mercedes but claim that he never told her the specific time for the meeting. Thus, she did not appear for the meeting.  With regard to the meetings with Dr. Friedmutter, Murray recalled that she met with him three or four times. However, she did not deny failing to appear for the meeting in question, which Dr. Friedmutter memorialized in his log of assistance.  Instead, she explained that she was meeting with a parent at the time of the meeting.  With regard to the professional assistance provided by Dr. Friedmutter, Murray indicated that because he did not have an agenda, the two would "struggle" with what they were going to do during their meetings.  She maintained, she did not find his assistance helpful because he did not model any specific technique for her.[95]

**The Parties' Position Related to the Alleged Failure to Attend Meetings with Principal Mercedes and Dr. Friedmutter**

The Department argued that both Principal Mercedes and Dr. Friedmutter credibly testified that she did not attend all of the meetings that were scheduled and Dr. Friedmutter's log of assistance serves to corroborate their testimony.

Respondent, in turn, argued that Murray credibly testified that at the time of the meeting she was with a parent and that she offered to meet with Principal Mercedes at another time but she received no response from him. Given these circumstances, Respondent argued, Principal Mercedes' disciplinary action was an abuse of power.  She also argued that she should not be held responsible for a schedule conflict created by Principal Mercedes.

---

[94] Department Exhibit 70 and Tr. 706
[95] Tr. at 956

36

**FINDINGS: Specifications 4 and 15**

The credible testimony of Principal Mercedes and Dr. Friedmutter and the documentary record evidence, including Dr. Friedmutter's log of assistance, is sufficient to establish Specification 4 and 15.

**Specification 16, which alleges Murray's failure to share her students' progress reports with parents and/or teachers during the parent/teacher conferences.**

Principal Mercedes testified that in November 2012, during parent-teacher conferences, he noticed that there were four signatures on Murray's sign-in sheet and became concerned that she had only met with four parents. Thus, he decided to investigate the matter.

Principal Mercedes scheduled a meeting with Murray and her Union representative for November 28, 2012, to discuss her work during parent/teacher conferences. At the meeting, Murray explained that she did not submit any sign-in sheet because the one in the office stated Mrs. Murray and she is Ms. Murray. Principal Mercedes testified that there is no other individual with her last name at the School. He also testified that Murray also admitted that she did not see any parent during the parent/teacher conference even though she was present at the School.[96] He further explained that his investigation revealed that the four signatures in her sign-in sheet with Murray's name belong to another teacher who used Murray's sheet. During the meeting, Principal Mercedes indicated that he also asked her to complete and submit weekly progress reports of the work she was doing with students because despite his numerous requests, there was "absolutely no written documentation" to show the work, if any, that she was doing with students.[97]

In her defense, Murray testified that she spoke to at least one parent during the parent/teacher conferences alleged in the Specifications. She described how she spoke to one parent who complained that her son's IEP was changed without her knowledge. She indicated that after speaking to the parent, in December 2012, she filed a complaint related to the change in the student's

---

[96] Department Exhibit 24
[97] Tr. at t 276-285

IEP.[98] This is the complaint that, according to Murray, led Principal Mercedes to retaliate against her.

In this regard, Murray testified that after she filed the complaint, she received Principal Mercedes' letter dated December 20, 2012, removing her from the room that was assigned to her and terminating her caseload.[99] She further maintained that Principal Mercedes never explained to her why he terminated her caseload of mandated cases. She described how she was worried about the students assigned to her and she did not know how to terminate her cases in the SESIS system. She testified that her caseload had never been terminated before and that she never received any guidance or training as to how to terminate cases in SESIS.[100] The effects on her students, Murray testified, was "chaotic" with a student calling her a "liar" and claimed that two of her students did not receive any counseling services for about a month.[101] With regard to her assignment to room 113, she testified that she received no guidance as to what she was going to do. She testified that she simply received a schedule and was told to meet with Ceballos to assist her with her new assignments. She also described how she had never performed the duties that were assigned to her after her mandated caseload was terminated.  At the time, she filed a grievance about the matter claiming she was placed in an out of license position.[102]

**The Parties' Position Regarding the Alleged Failure to Share the Students' Progress Reports during the Parent/Teacher Conferences**.

With regard to her failure to share the students' reports during the parent/teacher conferences, the Department indicates the record shows she was assigned Room 316A, which is where she needed to be.   Respondent's explanation as to why she did not meet with the parents, the Department argued, should not serve to excuse her failure. As a professional, the Department maintains, she should have tried to meet with the parents and share the students' reports with them. Instead, she did not do anything to attempt to meet with parents. Thus, the Specification should be sustained.

---

[98] Respondent Exhibit 6 and 7 and Tr. 896-898
[99] Tr. at 899
[100] Tr. at 902
[101] Tr. at 902-903
[102] Tr.at 906-907

On the other hand, Respondent contends that the charge should be dismissed because the Department failed to establish a Related Service Provider, such as her, is required to meet with a specific number of parents during the parent/teacher conference day, and failed to demonstrate what, if any, policy she violated.

**FINDINGS: Specifications 16**

I find the credible testimony of Principal Mercedes and the documentary evidence is sufficient to establish that Murray failed to meet, or make any efforts to meet, or to make herself available to meet, with parents of the students assigned to her so she could share her students' reports.   Principal Mercedes credibly testified that during the meeting that he held with Murray and her Union representative she admitted that she did not see any parents. He also credibly explained that another teacher used her sheet with her name.   Based on his credible testimony, i.e., that she admitted during the meeting that she did not see any parent, Murray's testimony that she spent the entire time with one parent is not supported by the credible record evidence.

**Specification 18 and 22, alleging that Murray failed to intervene when two students were involved in an altercation and her failure to follow supervisory directives when she failed to respond to an emergency situation, are discussed together to facilitate the analysis and discussion.**

The Department presented AP Lopez who testified that she was present when AP Harris asked Sullivan during lunchtime to locate Murray to deal with an allegation made by a parent.[103] Thereafter, AP Lopez testified, while she was at the office, she, AP Lopez, received a call from Murray stating she was at lunch in the teacher's lounge and could not come down to take care of the emergency.[104] AP Lopez testified that Murray came to the office a period later asking why they needed to see her. By then, she testified, the matter was already resolved.

AP Lopez also testified about a separate incident related to two female students who were about to get into a physical altercation. At the time, she explained that she was scheduled to conduct a formal observation.   It was Principal Mercedes, she explained, who asked her to contact Murray to assist her with the two students. AP Lopez testified that when she asked Murray to assist

---

[103] Tr. at 643
[104] Tr. at 644

her with the two students, her response was that she would not help until she received a written request from Principal Mercedes by email.

After the incident with the two students, AP Lopez testified that she held a meeting with Murray to discuss her refusal to assist her with the two students. At the meeting, AP Lopez testified, Murray maintained that Principal Mercedes had informed her that he would send her an email if he ever needed anything[105] and that she did not have the necessary skills to intervene with the type of crisis involved with the request for assistance.[106] During his testimony, Principal Mercedes indicated that gave Murray such instructions.

By letter dated January 16, 2013,[107] Principal Mercedes informed Murray he concluded that she engaged in insubordination, conduct unbecoming of a professional and failure to assist children at risk, by refusing to intervene the altercation with the two female students.   At the hearing, Principal Mercedes testified that AP Lopez informed him about Murray's refusal to assist him with the incident with the two female students and testified that his investigation disclosed that Murray refused to help her.

In her defense, with regard to the allegation that she failed to assist in an emergency situation with a parent, Murray conceded that she was told, "They are looking for you in the office," and was told that they were "looking all over" for her. However, she claimed that Sullivan, who told her they were looking for her, did not specify why they were looking for her. Murray did not remember what she did after Sullivan told her that they were looking for her in the office except to claim that she called the office several times and initially, no one answer the phone. She admitted that at some point, she was able to reach AP Lopez. According to Murray, AP Lopez did not tell her why they were looking for her and it was someone else who informed her that the matter was resolved.

With regard to the allegation that she failed to assist AP Lopez when two female students were involved in an altercation, Murray explained that when she was completing IEPs in room 113, AP Lopez simply came in "poked her head" and told her: "The principal has asked to see you to see these two girls that are

---

[105] Tr. at 613
[106] Tr. at 614
[107] Department Exhibit 30

fighting."[108] In response, she testified, she told AP Lopez that, "Okay, I'm going to email the principal and tell him that I'm taking care of the fight instead of doing IEPs."  By the time she sent the email, she indicated that the two girls were already in front of her. She claimed that none of the students spoke English and thus, she could hardly communicate with them.  She testified that their argument was by then resolved.   Thus, she described how she just took them to their classroom because hey were no longer angry.

**The Parties' Position Regarding the Alleged Failure to Intervene with an emergency situation or with an altercation between two students'**

The Department argued that AP Lopez credibly testified[109] that she informed Respondent, when she was in the teachers' lounge during lunch time, that Principal Mercedes wanted her to intervene. If Respondent was not a member of the students support services, as she claims, the Department argued she still had a duty to intervene and as a Related Service Provider, the safety of her students should have been a priority for her at all times.

Furthermore, with regard to Respondent defense, the Department argued, the alleged limited English of the students should not serve to excuse her inaction because Respondent could have contacted the bilingual guidance counselor to assist her. Instead, the Department argued, Respondent sat in a classroom just observing the students without speaking to them. Such conduct, the Department contends, was unprofessional, constitutes neglect of duty and unbecoming of her profession.

Respondent in turn argued that Murray credibly testified that she dealt with both students during the incident in question and described in great detail how she had trouble communicating with one of them who was a non-English speaking student. Respondent also argued that she credibly described how she walked both students to the classroom and remained with them to ensure the conflict was resolved. Thus, the Specification should be dismissed because she intervened and assisted the students during the altercation.

With regard to the emergency situation related to a parent that made a complaint during lunch time, Respondent argued that she credibly testified that

---

[108] Tr. at 915
[109] Tr. at 606-609

she was never informed with sufficient specificity about the emergency or that she needed to immediately go to the office.  It points out that there is no record evidence to establish that she was ever informed that an emergency situation existed when she was told that they were looking for her. According to Respondent, the record only demonstrate that she was simply told that "they were looking for her in the office", and shows that when she reported to the office, the matter was already resolved.   She also argued that AP Lopez' testimony tends to support her account of the events in question.

**FINDINGS: Specifications 18 and 22**

The credible testimony of AP Lopez is sufficient to establish that Murray was asked to assist with an emergency situation related to a parent who needed help and, during a different incident, also failed to assist with the two students involved in an altercation. In both instances, the credible evidence shows she declined to assist without any justification. In so doing, I considered that Murray admitted that Sullivan told her that they were looking for her. Nonetheless, as indicated by AP Lopez, she did not appear in the office until a period later when the matter was resolved.  Also, with regard to the two students involved in an altercation, AP Lopez' credibly testified that instead of helping her, as directed, Murray asked for Principal Mercedes to send her a written request.   This conduct, I find, was unprofessional, insubordinate, constituted neglect of duty and conduct unbecoming of her profession.

**Specifications 8, 19, 20, 21, alleging that Murray failed to establish a good rapport with the students and to maintain a good relationship with the staff; neglected her duties in the cafeteria when she stood idly by the cafeteria exit door without engaging the students; failed to meet with the students assigned to her for small group counseling; and spoke to Matos unprofessionally and slammed the door in Matos' face in front of students.**

On January 10, 2013, Principal Mercedes issued a letter to Murray to inform her of the importance of working in a collegial manner with all the service providers assigned to room 113, the room she shared with the guidance counselors after her mandated caseload was terminated, to clarify the different roles of service providers, including guidance counselors and social workers, and to remind her of the responsibilities to help any student who is in crisis regardless

of their respective positions.[110]   At the hearing, Principal Mercedes testified that he wrote the letter after he received various complaints by emails that the environment in room 113 had changed since Murray was assigned to the room, and that Murray's conduct was such that the students were not being serviced.

The Department presented Pou, the guidance counselor, who testified that about Murray's refusal or resistance to work with other service providers in room 113.   She described how Murray indicated to them that they should not worry about her, that she did not need to know anything, that she did not need to know where the emergency cards were located, and that "she was training to be deaf and blind."[111] On January 8, 2013, Pou testified that she communicated by email her observations about Murray to Principal Mercedes, AP Harris, AP Lopez, and to Ceballos.[112]   Pou reiterated how she tried not to communicate with Murray because when she initially attempted to welcome her to room 113, Murray's response was "I'm here to be trained to be deaf and blind."[113]

With regard to Murray's neglect of her duties when she was assigned to the cafeteria, Principal Mercedes testified that in January 2013, he assigned Murray to monitor potential crisis in the cafeteria for about three weeks. Principal Mercedes further explained that Dewey suggested for him to place her in "a non-threatening environment" to provide help to the students.   He also indicated that he placed her in the cafeteria for her to "pick up on any situation" with the students and "to mingle with the students" and "to be out on alert."    He further explained that he assigned her to the cafeteria, and removed her from her counseling duties, because he was not able to determine the impact of the counseling services she was providing on the students.

The Department presented Cinnamon Monet Harris ("AP Harris"), an assistant principal at the School, who testified that in February 2013, Principal Mercedes wanted to take a different approach to monitor the students' behavior in the cafeteria in an attempt to "diffuse anything that may be brewing"[114] and to prevent some of the conflicts among students that were taking place during lunch time.   In this regard, AP Harris testified, Principal Mercedes assigned the

---

[110] Department Exhibit 29
[111] Tr. at 736
[112] Department Exhibit 71 and Tr. at 731
[113] Tr. at 738
[114] Tr. at 553

guidance counselors, social workers, and other service providers to monitor the students' behavior in the cafeteria during lunchtime.[115] At the time, AP Harris testified that Principal Mercedes also asked her to model for Murray how to monitor students in the cafeteria, which she found "odd."[116]

On January 24, 2013, Principal Mercedes testified that he observed her standing close to the cafeteria's door far away from most students. Thereafter, he again observed her standing idly near the door on January 29, 2013, without engaging with any students. In response, he instructed her, in writing, by letters dated January 25th and January 29th, that she needed to circulate in the cafeteria.

At the hearing, Principal Mercedes explained that on January 28, 2013, when he asked Murray to circulate in the cafeteria to interact with the student, he modeled for her how to circulate in the cafeteria. In response, at the time, Murray asked him how many times he wanted her to circulate in the cafeteria.  Principal Mercedes further testified that he told her to circulate twenty times because he was not prepared to answer that kind of question and thus, he said twenty times as an example.  What followed, he explained, was that Murray made a mockery of him by circulating twenty times with her head down without interacting with the students.[117]

Effective February 11, 2013, Principal Mercedes removed Murray from her duties in the School's cafeteria and assigned her to counsel at risk students in small support groups.[118] At that time, Principal Mercedes explained that while Murray was assigned to lunch duty, she was still working with 6th and 7th grade students for non-mandated counseling.  After he removed her from the cafeteria, Principal Mercedes assigned her to conduct group counseling after her lunch duties with students at risk.

Principal Mercedes testified that he assigned Leslie Rosario a/k/a Leslie Matos-Lopez ("Matos"), the supervisors of the school aides, to select the students at-risk for Murray to counsel in the small groups. Principal Mercedes testified he asked Matos to select the students because she was "familiar with

---

[115] Tr. at 550-552
[116] Tr. at 552
[117] Department Exhibits 37, 38, 39 and 40. See also Hearing Officer Exhibit 1
[118] Department Exhibit 43 and Hearing Officer 1

the dynamics in the cafeteria." On February 12, 2013, He testified, Matos provided him and Murray with a list of the students that she had selected for group counseling.  Principal Mercedes indicated that he assigned her to use the Second Step Program to address the students' emotional issues because, he explained, it is a scripted program dealing with bullying, social development, and conflict resolution. He further testified that Ceballos assisted Murray with this assignment.[119]

By letter dated February 12, 2013,[120] Principal Mercedes memorialized a complaint made by Matos that Murray refused to service the students that she brought to her for group counseling. Principal Mercedes testified that Matos reported to him that Murray had refused to service the students brought in by her, as per his directive, and that Murray had slammed the door in Matos' face. Thereafter, Principal Mercedes testified, he relieved Murray from her duties to conduct group counseling during lunch periods and assigned her back to cafeteria.[121]

The Department presented Matos, who testified as follows: On February 12, 2013, Principal Mercedes asked her to select students she believed were at risk, to identify which students were being disruptive during the two lunch periods she was covering and to prepare a list of the students. As instructed, she created a list of about 15 students at risk in the fifth, sixth and seventh grades and submitted the list to Principal Mercedes for his review. Thereafter, she escorted the students from the cafeteria to room 101 where, she indicated, Murray was supposed to provide group counseling. The first day, she explained, she broke up the students in two groups. Shortly after returning to the cafeteria, she testified, the first group of students came back and informed her that Murray told them that they did not need to be at her room.  At that time, Matos explained, she returned to room 101 to speak to Murray, who then told her that the students were not on her list and asked Matos for a copy of the list. Matos testified that she went to get a copy of the list and returned to see Murray with the list and the

---

[119] Ceballos corroborated that she provided Murray with the Second Step Curriculum
[120] Department Exhibit 11 and Hearing Officer 1
[121] Department Exhibit 46 and Hearing Officer 1

students on the list. Even then, Matos testified, Murray refused to see the students.[122]

On February 13, 2013, Matos testified that she again escorted the students to Murray but when she arrived, there was another group of students in the room with Murray. When she knocked on the door, Matos indicated, a student opened the door, and when Murray saw her, Matos testified, she began to scream at her that she was not going to see the students she brought. Specifically, Matos testified that while screaming, Murray told her, "that she was not going to see these kids, that she had nothing to do with them, that I needed to take them back." At that time, according to Matos, Murray, "literally walked to the door, kicked the door shut in my face." She described how she had to leave with the students while the students inside Murray's room were "rowdy."[123] She indicated that the entire incident took place in front of the students. Matos described how upset she was about the incident and how disrespected she felt about it.

In response, Matos testified, she sent an email AP Harris and Principal Mercedes requesting a meeting to address the incident to ensure that it would no reoccur.  At the meeting, Matos testified, Murray stated that she did not recall most of the incident and acted, according to Matos, as if it had not happened. Prior to the incident described by Matos, she, Matos, described her relationship with Murray as "great" and stated that, "it was good."[124]

AP Harris corroborated that Matos reported the incident to her and that she complained that Murray had screamed at her and slammed the door on her face in front of the students. On February 20, 2013, AP Harris held a meeting with Murray, Matos, and AP Lopez to investigate the incident between Matos and AP Harris. Thereafter, AP Harris issued a letter dated March 6, 2013,[125] to Murray informing her that she had concluded that she acted unprofessionally when she slammed the door in Matos' face. At the hearing, when asked about her conclusion, AP Harris explained that,  "Murray practically admitted it in her own way that she did" because she was justifying her conduct during the meeting

---

[122] Tr. at 581-583
[123] Tr. at 583-584
[124] Tr. at 589
[125] Department Exhibit 67 and Tr. at 563

and claiming that she was going back and forth with the principal and her frustrations.[126]

In her defense, with regard to the allegation that she did not have a good relationship with her colleagues and other staff members, Murray testified about a meeting held on January 9, 2013, with other service providers, where, according to her, she was attacked because everyone kept accusing her of numerous things that she had not done. Thus, she described how she left the room upset because she was about to cry.[127] Nonetheless, she denied that she did not have a good relationship with the staff.

With regard to her duties in the cafeteria, in her defense, Murray described the time Principal Mercedes modeled for her how to monitor potential crisis in the cafeteria as follows. She described it as a demeaning experience because all he did was to ask her to circulate the cafeteria 20 times. She said that she was talking to students while she was standing near the door, during the instance described by Principal Mercedes in his letter. She explained that she was standing near the door seeking some privacy so the student could talk to her. She further maintained that she had no idea what Principal Mercedes meant by monitoring students in crisis.[128] She described it as a traumatic experience because one student was counting as she circulated the lunchroom and because he kept going table by table scanning students' eyes to model for her.[129]

She conceded that in February 2013, she was assigned to do group counseling in room 101, using the Second Step Curriculum.[130] She indicated that she did not have a seventh grade curriculum but the students assigned to her were in the sixth grade. For this reason, she did not do the group counseling assigned to her. She then clarified that she worked with them using other materials that she had used in prior years.  She also claimed that because she had too many students assigned to her, she did not do the group counseling.[131] She could not recall how many students were assigned to her but described how she could not do group counseling with more than 8 students.

---

[126] Tr. at 564
[127] Tr. at 911
[128] Tr. at 921-922
[129] Tr. at 923-924
[130] Tr. at 928
[131] Tr. at 929-932

With regard to the incident with Matos, she testified that she was "stunned" when Matos brought sixth graders to her for counseling; that she did not remember receiving such directives to counsel sixth graders; and that her response to Matos was, "Let me go get my letter, so I can read it."  The letter, she explained, contained the assignment about what group of students she was supposed to counsel and in what room.  According to Murray, that is when, without anything else happening, Matos went to make a complaint to the Principal that she did not want to see the students.[132]. When Matos returned, Murray testified, she served the students that Matos brought to her. Thus, she testified that she never refused to service the students that Matos brought to her.

Murray also described how she was working with sixth graders when Matos "burst" into the room and accused her of kicking a student out of class. She conceded that she was not happy about it, and testified that in response, she asked her students if she had kicked anyone out of the class. Thereafter, Murray described how she ignored Matos and continued with her work. According to Murray, Matos then left the classroom.  She denied that she slammed the door in Matos' face and explained that the door does not slam because they have  "a drag" on them.[133]

**The Parties' Position Related to her Alleged failure to monitor the cafeteria, failure to service the students, established a rapport with students and her unprofessional conduct towards Matos:**

The Department asserts Matos' credible testimony is sufficient to establish that Respondent failed to service the students assigned to her.  The excuse asserted by Respondent, i.e., that she did not have a list of the students, the Department argued, is not credible. The Department maintains that Matos credibly testified that she gave her the list of students.  Similarly, Respondent's explanation that she could not serve the students because they were in the sixth grade and not the seventh grade, should not serve to excuse her misconduct. The Department argued that there was no significant difference between 6th and 7th grades students.  In this regard, the Department indicates that the Second Step Manual for seventh graders also includes, "the scope and sequence" for sixth graders.

---

[132] Tr. at 932
[133] Tr. at 962

With regard to Specifications 8, 9, and 18, related to her failure to monitor students in the cafeteria, the Department argued that this assignment shows Principal Mercedes' efforts to use the service providers' expertise to assist students during their lunch. It points out that Principal Mercedes credibly testified that he also assigned the guidance counselors and social workers to do the same tasks. However, according to the Department, Respondent was the only one who thought she should not be monitoring the students in the cafeteria and made it more difficult than it needed to be.  The records shows, the Department argued, how she refused to actively monitor students at-risk by not circulating in the cafeteria and by not establishing any rapport with them. The Department also argued that the claim that she simply did not know what to do is not credible.

With regard to the allegations that she acted unprofessional and slammed the door on Matos' face, the Department argued that Matos credibly testified that she was directed by Principal Mercedes to deliver the student to Respondent for group counseling. Matos described in detail, the Department argues, how when she escorted the students to the room where Respondent was supposed to service the students, while at the door, Respondent yelled at her in front of the students and slammed the door on her face.

On the other hand, Respondent contends that Murray credibly testified that she performed her duties and circled the cafeteria twenty times, as directed by Principal Mercedes, and, at the time in question, was near the door to have a view of the entire cafeteria and for the students to be able to approach her and speak to her.  Also, Respondent contends that there is no record evidence to establish that she did not have a rapport and/or a relationship with the students assigned to her. According to Respondent, the credible record simply shows how Principal Mercedes demeaned her in front of students by asking her to circle the cafeteria 20 times.

As for her alleged failure to meet with the students, Respondent contends that at the time in question she was not assigned a case load of students, and argued that she credibly testified that AP Lopez, who was responsible for providing her with the list of students, never provided her with a list of the students assigned to her.

With regard to the alleged unprofessional conduct towards Matos, Respondent argued that she credibly denied that she spoke inappropriately to Matos or that she slammed the door in Matos' face. In addition, Respondent indicates that some of the Department's witnesses testified that it is impossible for the door in question to slam because it is equipped with rubber devices that prevent slamming, which tends to corroborate her testimony.  According to Respondent, the record simply contains the account of two individuals with two different interpretations of what took place, which is, according to her, insufficient to establish the allegation. Also, Respondent argued that the Department failed to identify what professional conduct policy, if any, she violated.

**FINDINGS: Specifications 8, 19, 20, and 21**

The credible testimony of Principal Mercedes, AP Harris and AP Lopez is sufficient to establish the allegations that she failed to establish a rapport with the students while assigned to the cafeteria and that she failed to service the students assigned to her for counseling. Matos' detailed account of what transpired when she escorted the students to room 101, including her credible description of how Murray screamed at her and slammed the door in her face, and how she had to return with the students because Murray refused to service them, is not only sufficient to establish that she was unprofessional, insubordinate, neglected her duties, and engaged in conduct unbecoming of her profession as alleged in the Specifications.

Similarly, I credit Principal Mercedes' account of how he observed her in the cafeteria standing by the door without engaging the students.  I believe the incident related to Principal Mercedes' request for Murray to circulate the cafeteria undermined both of them in front of the students. Her conduct, as alleged, was unprofessional and constitutes neglect of duties and conduct unbecoming of her profession.

**Specification 24, alleging that Murray disregarded the health, safety and well-being of a student, used poor judgment and/or failed to follow the School's protocol when she failed to properly handle a complaint made by a parent.**

By letter dated June 28, 2013,[134] Principal Mercedes memorialized a meeting held with Murray and her Union representative to discuss the report of

---

[134] Department Exhibit 16

the Special Commissioner of Investigation ("SCI"), wherein the SCI sustained the allegations that Murray failed to report an incident that occurred around February 2013, during a parent/teacher conference. Principal Mercedes testified that during the parent/teacher conference at issue, a parent told him that she had talked to Murray about her son communicating with a female student on Facebook who had threatened to kill or hurt herself if he did not go out with her on Valentines Day.  Principal Mercedes testified that he immediately contacted Carr, Pou, and Ceballos and asked them to speak with the parent.  He indicated that the parent of the female student met with Carr and Pou the next day after he assigned the case to them. He also reported the incident online, as required by the Chancellor's Regulations, as female-suicidal and as a failure to report an incident.  SCI investigated the allegation regarding Murray's failure to report the incident and it substantiated the allegations. Thereafter, Principal Mercedes held the meeting with Murray and her Union representative.   At the meeting, according to Principal Mercedes, no statements were made on Murray's behalf by the Union representative or by Murray.

The Department presented Ronald Vance ("Vance"), an investigator with the Special Commissioner of Investigations for the New York City School District ("SCI"), who was assigned in March 2013, to investigate the allegation of the parent who claimed the female student was harassing and stalking her son because she wanted a relationship with the boy, and that the female student had threatened to hurt or kill herself. As part of his investigation, he interviewed Principal Mercedes and Carr, the guidance counselor. While at the School, Vance testified he was introduced to Murray, who was in the main office. He described how he handed her his business card and informed her about the nature of his investigation.  At that time, Vance testified, Murray told him that she handled the situation; had documented everything that she had done after the parent reported the matter to her; and offered to submit the documentation to him.  According to Vance, she agreed to meet Vance at a later day in the School. However,  the day of the meeting, Vance testified that when he called to go to the School, he was informed that she was out on sick leave. Thus, he explained, he called her at her home.   When he followed up, and called her home, Vance testified, she told him that she wanted to seek legal counsel. In response, Vance

testified, he told her  that it was not a problem for her to seek legal counsel.[135] A couple of days later, Vance explained, Michael Siegel, an individual who identified himself as her attorney, informed him that Murray is a tenured employee and that he would send Vance a letter stating that she declined to be interviewed by his office. Vance substantiated the allegations that Murray failed to notify the principal or to properly report the matter.[136]

Pou, the guidance counselor, corroborated that she and Carr handled the parent's complaint upon the request of Principal Mercedes.  Pou testified that her son expressed to her that he was scared because of what a female student communicated to him on Facebook. Pou testified that the parent informed her that she sought the assistance of Murray and that nothing had been done and that is why, the parent explained to Pou, she brought the matter to the Principal's attention.[137] Pou also testified that she reported the parents' complaint in the Online Occurrence Reporting System ("OORS"), as she is required to do in accordance with the Chancellor's Regulations.[138]

In her defense, Murray conceded that she spoke with the parent at issue and that the student was assigned to her for counseling. Initially, she testified that she did not recall the specifics of the conversation. She recalled the complaint involved Facebook but claimed she was not familiar with any social media.  She did not remember the names or any details except that the parent told her that a girl "was going to do something to herself"[139] As a follow-up, Murray testified that she spoke to the female student who denied the parents' account. She maintained that because the female student was already in counseling, she spoke to the counselor and completed a referral form stating that the female student denied the parents' account.  Furthermore, she testified, that she did not do any assessment related to the concerns that she was suicidal because, "she said she didn't do anything like that."[140] She explained that because the girl was already in counseling, she, Murray, knew the student received the counseling. With regard to the female student, she testified that she left several telephone

---

[135] Tr. at 781
[136] Department Exhibit 74 and Tr. at 74
[137] Tr. at 750
[138] Tr. at 752
[139] Tr. at 949
[140] Tr. at 950

messages to the female students' mother but was not able to reach her. Murray also testified that she referred the male student for counseling at Astor Child Guidance, an organization that provides mental health services at the School, because he was involved in a related incident, and contacted the male student's mother.   Murray testified that the parents of the male student withdrew the referral because the parents believed that, "he didn't do anything wrong."  She also maintained that she properly reported the matter because she told AP Lopez about the matter. According to Murray, the only directive that she received from AP Lopez was for her to contact the parents, which Murray claimed that she did.[141]  Thus, she denied any wrongdoing with the manner that she handled the matter. Murray testified the administration at the School never asked her anything about the incident related to the parent's complaint or inquired about what, if anything, she did related to the matter.

She admitted that Investigator Vance requested to speak to her and gave her his business card.  She described how she replied, "good because I have some things to tell you." [142]  However, Murray testified that, at that time, she did not know the investigation involved her.[143]  Thereafter, while she was at home sick, Murray testified that she spoke to Investigator Vance. Nonetheless, she maintained that it was not about Vance asking her to cooperate with the investigation. Murray described how Vance asked her where she lived and how he told her that his parents lived around the same place but she did not remember anything else about their conversation and did not recall if Vance told her the purpose of his call. Murray consistently denied that she told Vance that she wanted to seek legal counsel before talking to him, which is what Investigator Vance memorialized in his report.[144]

Furthermore, she testified that Investigator Vance never asked her to meet or talk to her about his investigation, "Not once" she testified.[145] When probed to clarify the matter, Murray insisted that she never refused to be interviewed and that she was not "privy" to any conversation between Mike Spiegel and

---

[141] Tr. at 952
[142] Tr. at 967-968
[143] Tr. at 972-973
[144] Tr. at 974
[145] Tr. at 966

Investigator Vance.[146] She explained that attorney Spiegel represented her in a matter related to a whistleblower protection claim, but was not her legal representative regarding the investigation conducted by Vance and maintained that she gave him no authority to speak to Vance.  Specifically, she testified that she had no knowledge about Spiegel informing Investigator Vance that she was not going to participate in his investigation and that she never told Spiegel about the existence of the investigation conducted by Vance.[147]

### The Parties' Position Regarding the Alleged Failure to Properly Handle the Parent's Complaint

The Department argued that the parent's complaint involved allegations of student to student harassment and an allegation that the female student was threatening to harm herself if the male student did not return her calls for affection during on Valentines Day. It also notes that the investigation by Vance revealed that Respondent failed to follow-up with the parent's complaint by failing to notify the administration of the situation and by failing to investigate the complaint. It also asks for me to consider how efficiently Pou, in contrast with Respondent, was able to handle the situation once the matter was reassigned to her.  All the steps taken by Pou, the Department argued, could have been taken by Respondent.  It also notes that SCI substantiated the allegation that she failed to properly report the incident.  It also argued that Murray denial about the nature of her communication with Vance and claim that she did not know about Spiegel's communication with Vance is simply not credible and serves to cast a shadow on all of her testimony.

Respondent, in turn, argued that she credibly testified that she addressed the parents' complaint and credibly described how she spoke to the students, referred one of them to an affiliated in-school mental health provider, and reached out to the students' parents.  Respondent also argued that she credibly testified that she informed AP Lopez of the steps she took to address the parent's complaint. In this regard, Respondent argued that the testimony of Vance tends to corroborate her testimony because his investigation, as described by him, revealed that she had called the parents of the students and that she reported

---

[146] Tr. at 967
[147] Tr. at 969-970, 973

the matter to AP Lopez. Given this record evidence, Respondent asks for this Specification to be dismissed.

**FINDINGS: Specification 24**

The credible testimony of Principal Mercedes, and Murray's own admission serve to establish the allegations that she failed to properly report and properly handle a parents' complaint that a female student had expressed that she wanted to kill or hurt herself if the male student did not go out with her on Valentines Day. Murray admitted that the parent of the male student informed her that the female student had expressed that she would hurt herself if he did not go out with her on Valentines Day. To ensure the safety and well being of the female students involved, I find, the information provided by the parent was sufficient for her, as a mandated reporter, to immediately report the matter to the administration and to immediately refer the female student for an assessment to determine if she had suicidal ideation. By her own admission, Murray did not take any of these steps. Her claim that she reported the matter, in passing, to AP Lopez, is without merit.   With her twenty-three years of experience at the Department, and as a licensed social worker, she knew or should have known how to properly report the incident.   Furthermore, without any credible and reliable evidence to corroborate that she referred the students for counseling, I find hard to believe that she actually referred them for counseling. In this regard, I considered that both Principal Mercedes and Pou credibly testified that the parent informed them that nothing was done after she reported her concerns to Murray.  Such conduct, I find, was in complete disregard for the safety of the students involved.

Also, in this case, the fact that the communication between the students occurred outside the school through social media is irrelevant.  The fact is, on this record,  the parent went to the School to report the matter because she was truly concerned about the well being and safety of the female student and Murray should have reported the incident and take the necessary steps to ensure the students' safety and well being. Her failure, I find, constitutes neglect of her duties and conduct unbecoming of her profession.

## PENALTY

As for the appropriate penalty for the established misconduct, I find termination of employment is not the appropriate remedy.  In so doing, I find that Murray's twenty-three years of satisfactory work performance serves to reduce the penalty in this case. Murray asked that if any incompetence or misconduct is established, a penalty of professional development related to any established deficiency is the appropriate penalty.  For the reasons discussed above that are related to the unsatisfactory ratings and the action plan prepared for teachers instead of a social service provider, this record is insufficient to establish whether Murray truly lacks the capacity to perform her work.  Given the circumstances of this case, Murray's failures and neglect of her job duties, which I find constitutes serious misconduct, and her "explain it to me" mode with matters that she knew or should have known, I believe, was mainly due to her passive resistance against Principal Mercedes.  While I find her conduct inexcusable, I am not convinced she is not capable of performing her job.  Most importantly, with regard to the established misconduct, in determining her penalty, I considered her inexcusable refusal to serve the students was egregious. Specially, in the case of the parent who admittedly informed her that a female student who communicated with her son had expressed that she wanted to kill or hurt herself. In this respect, I note, the penalty is not solely about her failure to report the parent's complaint or related to a failure to report an incident during a chaotic situation.  This case also involved her failure to act and to take any meaningful action to address the concerns expressed by the parent and to ensure the safety of the students.

For all these reasons, I find a fine of $ 7,500.00 should serve to ensure that, in the future, Murray properly perform all of her job duties, as directed, and that she notifies the parents and administration, as required by the Chancellor's Regulations, about any incident where the well-being and safety of the students are at stake.  This Opinion and Award should also serve to put Murray on notice that her failure to perform her job duties, as directed, or her failure to notify the administration of any similar incident, may result in a more severe discipline, including termination of employment.

## AWARD[148]

1.      Specifications 4, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24 are sustained.   Therefore, the Department has just cause to discipline Juanita Murray ("Murray" or "Respondent").

2.      Specifications 2, 3, 5 and 7 of the charges are dismissed for insufficient evidence to establish the alleged violations.

3.      For the violations listed above in paragraph 1, the penalty shall be a fine of $ 7,500.00, to be paid over a period of six months.

Dated: October 31, 2015

_____
Haydeé Rosario, Esq.

**AFFIRMATION**

STATE OF NEW YORK

COUNTY OF NEW YOK

I, Haydeé Rosario, Esq., affirm that I am the individual described herein and who executed the foregoing instrument, which constitute my Opinion and Award.

Dated:  October 31, 2015

_____
Haydeé Rosario, Esq.

---

[148] Note Specifications 1 and 6 were withdrawn by the Department.