UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JUANITA MURRAY,

               Plaintiff,

                                  **MEMORANDUM AND ORDER**

   - against -                        15-CV-3191 (RRM) (ST)

NEW YORK CITY BOARD OF EDUCATION;
ROBERT MERCEDES; and SUSAN CARR
LAGOMARSINI,

               Defendants.
-------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Juanita Murray brings this action alleging race- and age-based discrimination

and retaliation by her employer, the New York City Board of Education ("NYCBOE"), pursuant

to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Age

Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); and 42 U.S.C. § 1981

("§ 1981").  (Second Am. Compl. ("SAC") (Doc. No. 35-1).)[1]  Murray also alleges race-based

discrimination and retaliation by individual defendants, Robert Mercedes and Susan Carr

Lagomarsini, pursuant to § 1981.  (*Id.*)  She seeks declaratory judgments stating that defendants

have violated the federal laws at issue, as well as compensatory and punitive damages.  (*Id.* at

10.)  Before the Court is defendants' motion to dismiss, pursuant to Federal Rule of Civil

Procedure ("Rule") 12(b).  (Def. Mot. (Doc. No. 37, 39).)  For the reasons explained below,

defendants' motion is granted in part and denied in part.

---

[1] The second amended complaint was deemed filed on consent at a conference before the Court on January 25, 2018.

## BACKGROUND[2]

Murray is an African-American woman who was 55 years old at the time the second amended complaint was filed.  (SAC ¶ 9.)  She was employed as a social worker by NYCBOE from approximately 1992 to 2017.  (*Id.* ¶ 8.)  From 2003 to 2017, she worked at Middle School 390 in the Bronx under Principal Robert Mercedes, who, from 2004 through 2010, consistently rated Murray's performance as "satisfactory" in her annual evaluations.  (*Id.* ¶¶ 8, 10–11.)  However, from 2011 through 2013, as Murray "began approaching retirement age," Mercedes rated Murray's performance "[u]nsatisfactory."  (*Id.* ¶ 12.)

Mercedes is of "Hispanic Dominican nationality."  (*Id.* ¶ 6.)  Murray believes that Mercedes set out to target six "veteran, and costly, non-Hispanic staff members," and that he "ultimately succeeded in having five of the six staff members removed from their positions through trumped up charges, forced retirement, or forced medical leave."  (*Id.* ¶ 13.)  During the 2012–13 school year, Mercedes expressed in several staff meetings that "senior staff was 'too expensive,'" and that he would obtain legal assistance to have them removed.  (*Id.* ¶ 15.)

In September 2012, Mercedes gave Murray a "corrective action plan" geared towards teachers rather than social workers, and removed individual counseling sessions from Murray's caseload.  (*Id.* ¶¶ 14, 16.)  In January 2013, Murray was "removed from her room," and her entire caseload was assigned to other staff.  (*Id.* ¶ 17.)  Instead of social work, Murray was

---

[2] The following facts are taken from the second amended complaint unless otherwise noted, and are assumed to be true for the purposes of this Order.  The Court considers the § 3020-a hearing opinion, which is "integral" to the second amended complaint, in that Murray "relies heavily upon its terms and effect."  *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks omitted) (citation omitted).  (*See e.g.*, SAC ¶ 32 (alleging that Mercedes lied at the § 3020-a hearing); *id.* ¶ 33 (noting dates of the hearing); *id.* ¶ 37 (stating the outcome of the hearing, including the decision that termination was inappropriate); *id.* ¶¶ 42, 44 (citing the hearing as an example of a retaliatory act).)  The Court also relies on the decision of the New York State Supreme Court that reviewed the § 3020-a hearing opinion (5/16/2016 Order, Ex. E to Reiter Decl. (Doc. No. 38-5)), only insofar as reliance is necessary to decide defendants' argument on collateral estoppel.

required to perform "out-of-license" tasks, such as monitoring the cafeteria and working as a "classroom paraprofessional." (*Id.* ¶¶ 18, 23.) At a union grievance meeting in February 2013, NYCBOE representatives told Mercedes that social workers should not be assigned to cafeteria duty; however, he continued to order Murray to circulate the cafeteria during lunch. (*Id.* ¶ 19.) Murray filed a complaint with NYCBOE Office of Equal Opportunity ("OEO"), alleging that Mercedes favored younger, Hispanic employees. [3] (*Id.* ¶ 20.) Mercedes encouraged only non-Hispanic employees to leave, for example, when budget cuts required staff reductions. (*Id.* ¶ 20.)

Murray alleges that after the OEO complaint was filed, Mercedes retaliated by fabricating allegations that Murray did not follow protocol for cyberbullying incidents among students. (*Id.* ¶ 21.) She also claims that guidance counselor Carr Lagomarsini falsely alleged that Murray "took no action" regarding these incidents. (*Id.*) The Special Commissioner of Investigation ("SCI") substantiated the allegations, however, and Murray received a disciplinary letter. (*Id.* ¶ 22.) When Murray requested training on the protocol she allegedly had not followed, Mercedes denied her request, although it was mandatory training for all staff. (*Id.*)

In October 2013, Murray was served with disciplinary termination charges, pursuant to New York Education Law, Section 3020-a.[4] (*Id.* ¶ 24.) Murray's alleged inaction on cyberbullying was among the charges. (*Id.* ¶ 22.) She was subsequently reassigned to shred non-confidential papers, such as school bell schedules. (*Id.* ¶ 24.) She vaguely describes an incident in which "the machine jammed," "clippings fell on the floor," and Mercedes "contacted

---

[3] Murray states that she filed the OEO complaint in March 2013. (SAC ¶ 20.) The copy of the OEO complaint furnished by defendants to the Court indicates that Murray filled out the complaint on March 28, 2013. (OEO Compl., Ex. A to Reiter Decl. (Doc. No. 38-1).) However, defendants also submit what appears to be a cover sheet, which is dated April 2, 2013. (*Id.*)

[4] Section 3020-a enables the filing of disciplinary charges against tenured employees, which may result in a hearing imposing a range of penalties, including payment of fines or termination. N.Y. Educ. Law § 3020-a. The hearings are "quasi-judicial administrative actions." *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005).

School Safety to remove Plaintiff from the building." (*Id.* ¶ 25.)  Mercedes requested that

Murray undergo a psychiatric evaluation in connection with this incident, which deemed her

"fit." (*Id.* ¶ 26.)  She was "reassigned to an unsanitary basement storage room and directed to

clean it." (*Id.* ¶ 27.)  Murray was ordered to clean other rooms, as well, and to pack up a room

with another veteran African-American teacher. (*Id.*)  She submitted a complaint to the New

York State Department of Labor about the unsanitary work conditions in the basement. (*Id.*)

After she filed this complaint, in November 2013, Murray was reassigned to a different school

for the remainder of the school year. (*Id.* ¶ 28.)  On May 1, 2014, Murray filed a complaint with

the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging race and age

discrimination, and retaliation. (*Id.* ¶ 29.)

   In September 2014, Murray was ordered to return to Middle School 390, where her duties

included monitoring attendance, security doors, and halls. (*Id.* ¶ 30.)  During her first month

back, on September 23, 2014, "a staff member, close to Principal Mercedes" "verbally assaulted"

Murray with "racial epithets"; she "called her 'Nigger' repeatedly and waved a yardstick at her."

(*Id.* ¶ 31.)  Murray emailed Mercedes about the harassment, and observed the "read receipt"

attached to her email, which showed that he read the email on the night of September 23. (*Id.*

¶¶ 31–32.)  Mercedes later stated that he never saw Murray's email. (*Id.* ¶ 32.)  The next day,

Mercedes summoned Murray to a disciplinary meeting for alleged "deformation [sic] of

character" of the other staff member. (*Id.* ¶ 31.)  Neither Mercedes nor NYCBOE disciplined the

staff member for the derogatory comments. (*Id.* ¶ 32.)

   Murray received a "right-to-sue" letter from the EEOC, dated January 13, 2015. (*Id.*

¶ 40.)  The date on which Murray actually received this letter is a subject of dispute. (*See* Def.

Mot. at 9–11.)  Murray, proceeding *pro se* at the time, initially represented that she received the

letter on January 13, 2015.  (Am. Compl. (Doc. No. 16) at 7.)  In subsequent pleadings, she

clarified that she received a letter *dated* January 13, 2015.  (SAC ¶ 40.)  Murray also submitted a

sworn declaration recalling that she received the letter "the day after Martin Luther King day in

January 2015, which was January 20, 2015."  (Murray Decl., Ex. A to Pl. Mot. (Doc. No. 40-1) ¶

8.)

      In February 2015, Murray's § 3020-a termination hearing began.  (SAC ¶ 33.)

      On April 17, 2015, Murray initiated this civil case by filing a summons with notice in

New York State Supreme Court, Queens County.  (Pl. Mot. (Doc. No. 40) at 14.)

      In June 2015, the case was removed to this Court, (Notice of Removal (Doc. No. 1)), and

Murray's § 3020-a termination hearing concluded.  (SAC ¶ 33.)  While the result of the hearing

was pending, "[t]o further damage and harass" Murray, Mercedes "greatly reduced" her July

2015 paycheck by "illegally dock[ing]" her pay for seventeen days.  (*Id*. ¶ 34.)[5]

      In September 2015, Murray filed an injury report after she was hit by a ball in the

gymnasium, yet Mercedes ignored her complaint and failed to file the requisite paperwork.  (*Id*.

¶ 35.)

      On September 22, 2015, Murray won an appeal of her 2010–11 "[u]nsatisfactory" rating

in an Article 78 proceeding brought by her union on her behalf.  (*Id*. ¶ 36.)  The Appellate

Division, First Department found that Mercedes failed to provide "constructive criticism and

warnings during the entire school year," or to formally observe Murray and offer feedback,

"undermin[ing] the integrity and fairness of the process."  (*Id*.)

      In November 2015, the hearing officer issued a decision on the § 3020-a hearing.  (*Id*.

¶ 37.)  The hearing officer did not find grounds for termination, but ordered Murray to pay a fine

---

[5] Murray later recovered the money through the grievance process, albeit ten months later.  (SAC ¶ 34.)

of $7,500.  (*Id.*)  Murray's attempt to reverse, vacate, and set aside this ruling was denied by

Justice Manuel J. Mendez of the New York State Supreme Court, New York County.  (5/16/2016

Order, Ex. E to Reiter Decl. (Doc. No. 38-5).)

Thereafter, Murray was "assigned outside the school and compelled to join the Absent

Teacher Reserve (ATR) pool," in which teachers rotate around different schools in the Bronx.

(SAC ¶ 38.)  She was once again required to perform tasks outside her license, including

breakfast duty, lunch duty, and secretarial assignments.  (*Id*. ¶ 39.)

On December 16, 2016, Murray filed her first complaint in this Court, which is referred

to as the amended complaint.  This was the first time that Murray alleged violations of § 1981.

Murray asserts that in June 2017, she was "constructive[ly] discharge[d]."  (*Id*. ¶ 42.)

Murray does not explain the circumstances of her departure, other than that she "left NYCBOE

in September 2017."  (*Id*. ¶ 8.)

Murray submitted a second amended complaint, which was deemed filed on consent at a

pre-motion conference before the Court on January 25, 2018.  In the second amended complaint,

Murray asserts claims against NYCBOE for age and race discrimination, retaliation, and hostile

work environment in violation of Title VII and the ADEA.  (SAC ¶¶ 42, 44.)  Murray also

asserts claims against NYCBOE, Mercedes, and Carr Lagomarsini for race discrimination and

retaliation in violation of § 1981.  (*Id*. ¶ 46.)

NYCBOE, Mercedes, and Carr Lagomarsini now move to dismiss the second amended

complaint.  They argue that 1) Murray's ADEA and Title VII claims are untimely, as Murray

cannot change her initial representation of when she received the EEOC right-to-sue letter; 2) her

retaliation claims are barred by the doctrine of collateral estoppel; and 3) all of her claims must

be dismissed under Rule 12(b)(6) for failure to state a plausible claim to relief.  Defendants

assert that Murray fails to allege any adverse employment actions taken against her based on her age or race, and that her claims of retaliation are either factually incorrect or lack a causal connection.  (Def. Mot. at 23–24.)

## DISCUSSION

### I.     Statutes of Limitations

#### a.     300-Day Rule

In order to maintain a Title VII or ADEA action, parties must first file an administrative complaint with the EEOC or state agency within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e); 29 U.S.C. § 626(d)(l); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  Murray does not refute that the 300-day limitation applies here, nor does there appear to be any reason for exception.  Thus, any alleged discrete acts of discrimination or retaliation that occurred before July 5, 2013 – 300 days prior to Murray's May 1, 2014 filing with the EEOC – must be dismissed as time-barred.

Under both Title VII and the ADEA, claims accrue when plaintiff "knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994).  "The crucial time for accrual purposes" is when plaintiff "becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980), *cert. denied*, 450 U.S. 920 (1981)).

#### b.     90-Day Filing Requirement

In addition to the 300-day rule, "a claim under Title VII or the ADEA must be filed within 90 days of the claimant's receipt of a right-to-sue letter." *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) (citing 42 U.S.C. § 2000(e)-5(f)(1)).  "While the ninety-day filing requirement is not jurisdictional, courts apply this requirement strictly and waive it only if

equitable considerations justify an extension." *Ford v. Consol. Edison Co. of New York*, No. 03-CV-9587 (PAC), 2006 WL 538116, at *6 (S.D.N.Y. Mar. 3, 2006) (citing *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984)), *aff'd*, 225 F. App'x 19 (2d Cir. 2007).

Normally it is assumed that a notice provided by a government agency was mailed on the date displayed on the notice, and that a mailed document was received three days after its mailing. *See Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984) (noting that the presumed date of receipt of an EEOC notice is three days after its mailing); *Sherlock*, 84 F.3d at 525–26. However, this three-day presumption is rebuttable "[i]f a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail." *Sherlock*, 84 F.3d at 526.[6]

The amended complaint states that Murray received a right-to-sue letter from the EEOC on January 13, 2015. (Am. Compl. at 7.) The second amended complaint clarifies that Murray received a letter *dated* January 13, 2015. (SAC ¶ 40.) When Murray recognized that the date in the amended complaint was incorrect, she submitted a sworn declaration that, "to [her] best recollection," she received the letter "the day after Martin Luther King day in January 2015, which was January 20, 2015." (Murray Decl. ¶ 8.)

---

[6] In *Sherlock*, the court held that "a self-serving date-of-receipt notation on the claimant's copy of a right-to-sue letter" would not be sufficient evidence to rebut the three-day mailing presumption "unless the claimant also presented an affidavit or other admissible evidence of receipt on the noted date." 84 F.3d at 526. In that case, although the plaintiff did submit an affidavit, it stated merely "(a) that she had no recollection of when she received the letter, and (b) that her husband believed that she had received the letter on February 27 or 28." *Id.* No affidavit from her husband was submitted. *Id.* "Nonetheless, . . . the evidence that [another individual] did not receive the [same] letter until at least February 27 creates an issue of fact as to whether Sherlock received it at or about the same time." *Id.* The district court's dismissal of plaintiff's Title VII and ADEA claims on grounds that they were time-barred was vacated and remanded. *Id.*

If Murray received the letter on January 13, 2015 – the date listed in the complaints – the Court would assume that Murray received the letter on January 16, 2015, and that she was required to file any Title VII and ADEA claims by April 16, 2015.  Murray filed a summons with notice in state court on April 17, 2015, and thus, under this analysis, her claims would be untimely by one day.  (Pl. Mot. at 14.)

The Court cannot consider Murray's declaration in the context of a Rule 12(b)(6) motion to dismiss.  Generally, if a court considers "matters outside the pleadings" that have not been incorporated into the complaint, Rule 12(d) requires that the motion is treated as one for summary judgment.  *See Thomas v. City of New York*, No. 17-CV-06079 (ARR) (JO), 2018 WL 5791965, at *5 (E.D.N.Y. Nov. 5, 2018) (quoting Fed. R. Civ. P. 12(d)).  Whether a district court declines to consider extraneous documents or converts the motion to one for summary judgment is a matter of discretion.  *Id*. (citing *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 357 (S.D.N.Y. 2016)).  If a court decides to convert a motion to dismiss into a motion for summary judgment, "it must ensure that the parties have notice of the conversion."  *Id*. (citation omitted); *see also Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir. 1990) ("The essential inquiry" is whether the party "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." (internal quotation marks omitted) (citation omitted)).

Here, conversion to a summary judgment motion is appropriate with respect to the issue of timeliness under the 90-day statute of limitations.  While the Court does not condone amendment through motion papers, Murray does not aim to circumvent the pleading rules, but rather aims to correct a mistake she made while filing *pro se*.  Defendants had sufficient notice

that the Court might consider facts beyond the pleadings on the issue of timeliness, as they analyzed and responded to Murray's arguments on this issue in their motion papers.  (*See* Def. Mot. at 10–12; Def. Reply (Doc. No. 41) at 4.)  Thus, defendants may "claim neither surprise nor prejudice by the conversion" to a motion for summary judgment with respect to this discrete issue.  *Tsanganea v. City Univ. of New York*, No. 06-CV-15366 (DAB) (JCF), 2008 WL 4054426, at *3 (S.D.N.Y. Aug. 28, 2008) (internal quotation marks omitted) (citation omitted), *adopted by*, No. 06-CV-15366 (DAB) (JCF), 2008 WL 4548857 (S.D.N.Y. Oct. 8, 2008).

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases).  Thus, "[a] defendant moving for summary judgment must

prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

Murray's sworn declaration states that, to her best recollection, she received the right-to-sue letter on January 20, 2015, approximately one week after the letter is dated. (Murray Decl. ¶ 8.) When Murray received this letter, she had an attorney, who told her that if she filed in state court by April 17, her complaint would be timely. (*Id.* ¶ 9.) In addition to these specific recollections, Murray adds that she "[has] noticed that it often takes more than a week for [her] to receive mail sent from lower Manhattan to [her] Northern Westchester home address." (*Id.* ¶ 7.) In support of this general observation, she attaches as an exhibit a letter from a New York City agency, dated January 22, 2018, which she received no earlier than January 29, 2018, as evidenced by the Informed Delivery Daily Digest she received from the United States Postal Service.[7] Through this sworn statement and evidentiary showing, Murray raises "a question of fact as to whether" she "received [the mailing] within three days of its typewritten date." *Sherlock*, 84 F.3d at 526.

Defendants' argument that Murray should be held to the allegations in the amended complaint, filed *pro se*, that she received the letters on the same day as the dates of the letters themselves, is unavailing. The idea that mail could arrive on the same day it was sent defies practical experience; drawing all inferences in Murray's favor, it is likely that this was an inadvertent error. Defendants' reliance on *Jones v. Rochester City Sch. Dist.* is unpersuasive. 676 F. App'x 95 (2d Cir. 2017) (summary order), *as amended* (Jan. 26, 2017). There, plaintiff

---

[7] With the "Informed Delivery" service, "Users receive email notifications containing grayscale images of the exterior, address side of incoming letter-sized mailpieces that are arriving soon." USPS, https://informeddelivery.usps.com/box/pages/intro/start.action (last accessed Mar. 12, 2019).

was barred from rescinding his statement that he received his right-to-sue letter on a certain date – an allegation that he maintained through summary judgment. *Id*. at 97. The Second Circuit held that plaintiff could not, on appeal, provide evidence that the letter was mailed, rather than received, on that date, as it contradicted clear statements made in his summary judgment papers. *Id*. Murray's case is distinct, however, as she corrected her error not on appeal, but during the pleadings stage.

Given that there is a genuine issue of fact as to when Murray received the right-to-sue letter, summary judgment with respect to timeliness under the 90-day statute of limitations must be denied. At this stage in the litigation, the Court will not dismiss Murray's Title VII and ADEA claims as untimely.

## II.    Collateral Estoppel

Defendants argue that Murray's Title VII, ADEA, and § 1981 retaliation claims are barred by the doctrine of collateral estoppel because the issue of retaliation was brought forth and litigated in her § 3020-a hearing. (Def. Mot. at 13–17.)

The doctrine of collateral estoppel bars re-litigation of a legal or factual issue that was previously decided in a prior action where: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceedings, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Smith v. N.Y.C. Dep't of Educ.*, 808 F. Supp. 2d 569, 577–78 (S.D.N.Y. 2011) (quoting *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001)). It is well settled that "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it

12

would be entitled to in the state's courts." *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 312 (2d Cir. 2005) (internal quotation marks omitted) (citation omitted). "The Second Circuit has explicitly held that a Section 3020-a hearing is a quasi-judicial administrative action whose findings are entitled to preclusive effect" as long as the requirements of collateral estoppel are met. *Mohammed v. N.Y.C. Dep't of Educ.*, 932 F. Supp. 2d 420, 427–28 (E.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Burkybile*, 411 F.3d at 308).

Nevertheless, while there is a "lenient presumption in favor of administrative estoppel," evidence of legislative intent to the contrary may overcome that presumption. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). With respect to claims under Title VII and the ADEA, "judicially unreviewed findings of a state administrative agency" have "no preclusive effect on federal proceedings." *Solimino*, 501 U.S. at 106 (with regard to age discrimination claims); *see Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."). In *Solimino*, the Supreme Court found that because the ADEA's filing provisions contemplate federal review of state administrative findings, such review would be superfluous if state findings were given preclusive effect. 501 U.S. at 111–12; *see also Mazur v. N.Y.C. Dep't of Educ.*, 53 F. Supp. 3d 618, 631 (S.D.N.Y. 2014) (unreviewed § 3020-a findings did not preclude plaintiff from arguing discrimination claims under the ADEA), *aff'd*, 621 F. App'x 88 (2d Cir. 2015). Similarly, in *Elliott*, the Supreme Court found that Title VII's provision requiring the EEOC to give "substantial weight" to state administrative findings, but not preclusive effect, indicated a legislative intent not to grant preclusive effect in federal courts. 478 U.S. at 795; *see also Raniola v. Bratton*, 243 F.3d 610, 623–24 (2d Cir. 2001) ("The Supreme Court has held that

Congress, in enacting Title VII, generally intended to eliminate the binding effect of prior administrative findings and provide a *de novo* trial on Title VII claims." (citing *Elliott*, 478 U.S. at 795)).  By contrast, in the same case, the Supreme Court found no evidence that Congress intended to depart from the traditional presumption of preclusion with respect to claims under "the Reconstruction civil rights statutes," including § 1981.  *Elliott*, 478 U.S. at 795.

Here, the § 3020-a opinion and award was reviewed by Justice Mendez of the New York State Supreme Court.  (*See* 5/16/2016 Order.)  However, Justice Mendez did not make any findings on the issue of retaliation that Murray presents before this Court.  *See Raniola*, 243 F.3d at 624 (administrative finding only has preclusive effect on Title VII claim if the state court issued a judgment "*on the same claim or issue*" (emphasis added)); *Scaglione v. Mamaroneck Union Free Sch. Dist.*, 144 F. App'x 120, 122 (2d Cir. 2005) (summary order) ("Under Supreme Court and Second Circuit caselaw . . . unreviewed state administrative findings do not have preclusive effect in the Title VII context.").  The word "retaliation" is nowhere to be found in the New York State Supreme Court opinion.  The closest thing that Justice Mendez referenced was Murray's allegation that the hearing officer "ignored evidence" that Mercedes "reacted" to complaints Murray filed in December 2012 and January 2013 by removing her from her social work duties.  (5/16/2016 Order at 3.)  Those complaints were submitted to the United Federation of Teachers ("UFT"), and contained allegations related to the school's management of special education.  (Def. Mot. at 14.)  The retaliation claim that Murray asserts before this Court – that she suffered from retaliatory acts because she filed a complaint of discrimination with the OEO – is distinct.  Thus, the state court did not make factual findings with respect to Murray's retaliation claim.  Given that courts give "preclusive effect only to a state agency's findings that have been judicially reviewed" for claims brought pursuant to Title VII and the ADEA, Murray's

14

retaliation claims are not precluded under these statutes. *Ferraro v. N.Y.C. Dep't of Educ.*, 752 F. App'x 70, 73 (2d Cir. 2018) (summary order).

Accordingly, Murray is not collaterally estopped from alleging retaliation under Title VII and the ADEA. On the other hand, if Murray raises issues that were already litigated and decided in the § 3020-a hearing, she could be barred from retrying those same issues under the guise of a § 1981 claim. The Court declines to address this question, however, because for the reasons stated, *infra*, Murray's § 1981 claims are dismissed on other grounds.

## III. Failure to State a Claim

### a. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) requires a court to evaluate the legal, rather than factual, sufficiency of a complaint. "To survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Detailed facts are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). The determination of whether "a complaint states a plausible claim for relief" is "a context-specific task that requires" the court to "draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

### b. Race Discrimination under Title VII

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  To establish a *prima facie* case of discrimination under Title VII, plaintiff must show that:  1) she is a member of a protected class; 2) she is qualified for her position; 3) she suffered an adverse employment action; and 4) circumstances give rise to an inference of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972) (setting forth the traditional burden-shifting framework); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). Although a complaint alleging discrimination "need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss . . . it must at a minimum assert nonconclusory factual matter sufficient to nudge[] [its] claims . . . across the line from conceivable to plausible to proceed."  *Vega*, 801 F.3d at 84 (quoting *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 245 (2d Cir. 2014)).

NYCBOE does not appear to dispute that Murray has adequately alleged the first two elements of a race discrimination claim.  With respect to the third element, an adverse employment action occurs when a plaintiff endures "a materially adverse change in the terms and conditions of employment."  *Id.* at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). The adverse action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Sanders*, 361 F.3d at 755 (internal quotation marks omitted) (citation omitted). Examples include "termination of employment, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id.*

16

As for the fourth element, a plaintiff may raise an inference of discrimination by plausibly alleging that her race was "a substantial or motivating factor" in the employer's decision to take the adverse action.  *Vega*, 801 F.3d at 85 (internal quotation marks omitted) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)).  Title VII does not require that race was the only "but for" cause, as the statute allows "mixed motive" cases to proceed.  *Id*. at 86.  Moreover, the Second Circuit has recognized that "direct, smoking gun, evidence of discrimination" rarely exists.  *Id.* (internal quotation marks omitted) (citation omitted).  Accordingly, plaintiffs may use indirect proof, "creating a 'mosaic' . . . identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination."  *Id*. at 87 (internal quotation marks omitted) (citation omitted).  A court must assume that the allegations in the complaint are true, "even if [they are] doubtful in fact."  *Id*. at 86 (citation omitted).  Indeed, plaintiff has a "minimal burden"; she must only allege facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).  The "ultimate issue" in employment discrimination cases is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by . . . a discriminatory reason."  *Id*. at 87 (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997)).

Thus, to defeat NYCBOE's motion to dismiss, Murray must plausibly allege that (1) her employer took an adverse action against her, and (2) her race was a motivating factor in the decision.

Murray pleads a plausible discrimination claim under Title VII, based on her allegation that she suffered significantly diminished job responsibilities.  The Second Circuit has previously

held that where an employer has significantly reduced or altered job responsibilities, this may

constitute an adverse employment action. *See Galabya*, 202 F.3d at 641 (evidence that

reassignment was "materially less prestigious, materially less suited to [plaintiff's] skills and

expertise, or materially less conducive to career advancement" may suffice to establish an

adverse action); *Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789, 791 (2d Cir. 1997) (issue of

material fact existed as to whether reduction of plaintiff's job duties to "largely clerical tasks"

constituted an adverse action); *de la Cruz v. N.Y.C. Human Res. Admin.*, 82 F.3d 16, 21 (2d Cir.

1996) (transfer to less prestigious position satisfied the adverse action element for purposes of

stating a *prima facie* case under Title VII); *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir.

1980) (art teacher's transfer from high school to elementary school constituted adverse

employment action, as the "radical change in the nature of the work" was effectively a

"demotion" that rendered her twenty years of experience "useless").

Trained as a social worker, Murray accepted a position at Middle School 390 with the

expectation that she would perform social work; yet over time, Murray was compelled to spend

her days on security detail and secretarial tasks.  Considering conduct that occurred after July 5,

2013, for purposes of the statute of limitations, Murray was assigned various out-of-license

duties in lieu of casework that severely reduced her job prestige and responsibility, including

breakfast duty, tracking attendance, and monitoring security doors.  (SAC ¶ 30, 39.)  For part of

2013, Murray's job was to shred non-confidential papers.  (*Id.* ¶ 24.)  She was later reassigned to

clean a basement storage room that was so unsanitary that she felt inclined to file a complaint

with the New York State Department of Labor.  (*Id.* ¶ 27.)  Murray's reassignments to these

tasks – a far cry from social work – materially changed the conditions of her job.  The

reassignments resulted in "change[s] in responsibilities so significant as to constitute a setback in

18

[her] career," and thus, Murray has plausibly alleged adverse employment actions. *Galabya*, 202
F.3d at 641 (citing *Rodriguez*, 620 F.2d at 366).

Murray has also sufficiently alleged that her race was at least a motivating factor in the
reduction of her responsibilities. Murray describes, among other things, an incident in which a
co-worker, who is close to Mercedes, repeatedly yelled "nigger" while waving a yardstick at her.
(SAC ¶ 31.) The Second Circuit has stated that "perhaps no single act can more quickly alter the
conditions of employment and create an abusive working environment than the use of an
unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his
subordinates." *Daniel v. T & M Prot. Res., LLC*, 689 F. App'x 1, 2 (2d Cir. 2017) (summary
order) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir.
2014)). While Mercedes did not personally use the racial epithet, he sanctioned its use by
ignoring Murray's email and failing to investigate or even acknowledge her allegations, except
by summoning Murray to an unfounded disciplinary meeting accusing her of defamation. By
plausibly alleging Mercedes' deliberate indifference towards the use of racial slurs, Murray has
met her minimal burden of raising an inference that race was at least a factor in the ongoing
diminishment of her job responsibilities. *See Francis v. Kings Park Manor, Inc.*, No. 15-CV-
1823, 2019 WL 1006554, at *9 (2d Cir. Mar. 4, 2019) (finding, in a different context, that
"deliberate indifference to racial discrimination" was actionable under § 1981).

It is possible that other explanations exist for the reduction of Murray's duties. However,
this does not render Murray's allegations insufficient as a matter of law, as "competing
explanations are better evaluated at the summary judgment stage or beyond," not on a motion to
dismiss. *Vega*, 801 F.3d at 89; *see also Brown v. Daikin Am., Inc.*, 756 F.3d 219, 230 (2d Cir.
2014) ("That there may be other explanations for the defendants' employment decisions does not

render [plaintiff's] allegations of discrimination inadequate as a matter of law."). Accordingly, NYCBOE's motion to dismiss Murray's claims of discrimination under Title VII is denied.

### c. Hostile Work Environment Under Title VII

To state a hostile work environment claim, a plaintiff must present facts that show that the alleged conduct (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's [protected class]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id*. at 23. Further, given that these claims typically involve continuous conduct, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).

While defendants are correct that isolated acts typically do not suffice, *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted), the Second Circuit has "often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Daniel*, 689 F. App'x at 2 (internal quotation marks omitted) (quoting *Redd*

*v. N.Y. Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012)); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013).  In *Daniel*, the Second Circuit acknowledged the possibility that "the one-time use of the slur 'nigger' by a supervisor to a subordinate" may "by itself, support a claim for a hostile work environment."  689 F. App'x at 2 (citation omitted).  By recognizing that "no *single act* can more quickly alter the conditions of employment" than the use of the word "nigger" by a supervisor, the Second Circuit has suggested that a single use of that term may be actionable.  *Rivera*, 743 F.3d at 24 (emphasis added).  There is no "'magic number' of harassing incidents" that enables liability, "nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."  *Id*. at 22 n.5 (internal quotation marks omitted) (citation omitted); *see also Albert-Roberts v. GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (summary order) ("There may well exist circumstances where a single use of the word 'nigger' would rise to the level of a hostile work environment . . . .").  Further, the Second Circuit has held that, "the use of racially offensive language is particularly likely to create a hostile work environment when . . . it is presented in a physically threatening manner."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *Rivera*, 743 F.3d at 24.

Even if Murray does not allege that Mercedes affirmatively made the comment, tolerance of this particular racial slur by a superior may be sufficient to support a hostile work environment claim.  *Francis*, 2019 WL 1006554, at *9 (finding plausible allegations of discrimination, where defendant landlord had the authority to discipline person repeatedly calling plaintiff "nigger," but failed to do so, thereby facilitating a hostile environment).  By alleging that her coworker waved a yardstick at her while repeatedly using this repugnant slur, and that her superior effectively endorsed the behavior by ignoring her concerns, Murray has raised a triable issue as to whether a hostile work environment existed.  Considering the totality of the circumstances, dismissal is

inappropriate at this stage; Murray has adequately alleged discriminatory intimidation that created an objectively and subjectively hostile work environment because of her race.

### d. Age Discrimination under the ADEA

Under the ADEA, it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA and Title VII discrimination claims are analyzed under the same legal framework of *McDonnell Douglas*. 411 U.S. 792 (1973). To establish a *prima facie* case of discrimination under the ADEA, a plaintiff "must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). As with Title VII claims, plaintiffs are not required to plead a *prima facie* case to defeat a motion to dismiss. *Littlejohn*, 795 F.3d at 312 (Courts "focus only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements . . . in the initial phase of a litigation."). However, distinct from Title VII claims, to survive a motion to dismiss under the ADEA, a plaintiff must plausibly allege that age was the "but-for" cause of the adverse action. *Gorzynski*, 596 F.3d at 106 (citation omitted). Age cannot simply be a motivating factor; rather, age must be "'the reason' that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176 (2009) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

Murray sufficiently states a claim for age discrimination under Title VII. As discussed, *supra*, her reassignment to out-of-license duties qualifies as an adverse employment action that substantially altered her job conditions and amounted to more than "a mere inconvenience."

*Sanders*, 361 F.3d at 755. Murray also plausibly alleges that her age may be the reason for the reduction in her responsibilities. After years of satisfactory performance, Murray "suddenly began" receiving negative ratings as she approached retirement age. (SAC ¶ 12.) During several staff meetings, Mercedes stated that senior staff are "too expensive," and that he would obtain legal assistance to have "those staff members removed." (*Id.* ¶ 15). Mercedes allegedly targeted "six veteran, and costly, non-Hispanic staff members," of which he successfully terminated five. (*Id.* ¶ 13.) Mercedes' alleged scheme to target older staff members, and the sudden change in Murray's performance ratings, allow the Court to draw the reasonable inference that Mercedes diminished Murray's responsibilities to facilitate her removal as she approached retirement age. Courts have found the requisite "minimal inference of discriminatory motive" when confronted with similar allegations. *See Jones v. N.Y.C. Dep't of Educ.*, 286 F. Supp. 3d 422, 449 (E.D.N.Y. 2018) (A principal's alleged reputation for disliking "old timers" and the replacement of older staff members with younger ones sufficiently created the "minimal inference of discriminatory motive" for plaintiff's termination.); *Powell v. Delta Airlines*, 145 F. Supp. 3d 189, 200 (E.D.N.Y. 2015) (Where plaintiff began receiving baseless negative reports after his fifty-third birthday, after six years of working with no performance issues, he plausibly alleged age discrimination.); *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 215 (E.D.N.Y. 2014) (Plaintiff sufficiently stated an age discrimination claim by alleging that she received unfounded negative ratings in an effort to remove her from the school, and that younger teachers did not receive the same treatment.). Murray's allegations, liberally construed, give rise to a plausible inference of age-based discrimination. Accordingly, the NYCBOE's motion to dismiss Murray's claims of discrimination under the ADEA is denied.

### e.  Hostile Work Environment under the ADEA

The standard for pleading a hostile work environment claim is the same under Title VII and the ADEA.  *Kassner*, 496 F.3d at 240 ("An actionable discrimination claim based on hostile work environment under the ADEA is one for which the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment . . . ." (quoting *Harris*, 510 U.S. at 21)).  "[A]t the pleading stage of the case," plaintiffs are only required to provide "a short and plain statement of the claim that shows that plaintiffs are entitled to relief and that gives the defendant fair notice of plaintiffs' claim for hostile work environment and the grounds upon which that claim rest." *Kassner*, 496 F.3d at 241 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

Mercedes' alleged inappropriate comments about age at staff meetings, targeting of veteran staff members, sudden issuance of negative evaluations as Murray approached retirement age, and the subsequent reduction of her responsibilities, sufficiently evince an atmosphere of hostility towards older staff.  The Second Circuit has previously noted that inappropriate comments about age are probative of a hostile work environment.  *See Kassner*, 496 F.3d at 240 (allegations that defendant made "degrading" comments about age were sufficient for plaintiff to proceed to discovery); *see also Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 722 (E.D.N.Y. 2015) (allegations of "repeated comments" about plaintiff's age sufficed to give defendants "fair notice" of a hostile work environment claim).  At this stage in the proceeding, Murray has adequately alleged that the school was "permeated with discriminatory intimidation" with respect to age, and she is entitled to discovery on this claim.  *Alfano*, 294 F.3d at 373.  Thus, defendants' motion to dismiss her claims of hostile work environment under the ADEA are also denied.

24

**f.  Section 1981 Claims**

Section 1981 prohibits discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment.  *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . .").  To assert a claim under § 1981, a plaintiff must allege that "(1) he or she is a member of a protected class, (2) the defendant intentionally discriminated against him or her on the basis of membership in that protected class; and (3) the discrimination concerned one of [section] 1981's enumerated activities." *Johnson v. City of New York*, No. 16-CV-6426 (KAM) (VMS), 2018 WL 1597393, at *17 (E.D.N.Y. Mar. 31, 2018) (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)).  The "core substantive" pleading standards that apply to Title VII are largely applicable to § 1981 claims alleging discriminatory conduct.  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004), *superseded in part on other grounds*; *see also Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (recognizing that § 1981 claims are analyzed under *McDonnell Douglas*).

As an initial matter, the parties fail to recognize that where defendants are state actors, 42 U.S.C. § 1983 ("§ 1983") is the exclusive vehicle for alleging violations of § 1981.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) ("We hold that the express 'action at law' provided by § 1983 . . . provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.").  After a period of ambiguity in the case law, the Second Circuit recently joined nine of its sister circuits to conclude that "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018); *see also Zaniewska v. City of New York*, No. 11-CV-2446 (RRM) (VVP), 2013 WL 3990751, at *8 (E.D.N.Y. Aug. 5, 2013)

("[T]he Court notes that where defendants are state actors, Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue discrimination claims for damages." (citing *Jett*, 491 U.S. at 734)), *aff'd*, 569 F. App'x 39 (2d Cir. 2014).

The Second Circuit has endorsed the "general rule" that "state employment is sufficient to render [] defendant a state actor, which, in turn is sufficient for a finding of action taken under color of state law for purposes of [section] 1983." *Johnson*, 2018 WL 1597393, at *19 (quoting *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 426 (S.D.N.Y. 2012)).  Even if plaintiff sues a person who is a state actor in her *individual* capacity, she must employ § 1983.  *See Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 400–01 (S.D.N.Y. 2008) ("The holding in *Jett* has been interpreted to encompass not only governmental entities, but also individuals sued in their individual capacities who are 'state actors.'" (citations omitted)); *see also Gadsden v. N.Y.C. Sch. Constr. Auth.*, No. 17-CV-5829 (PKC) (SJB), 2018 WL 1865911, at *3 (E.D.N.Y. Apr. 18, 2018); *Bamba v. Fenton*, No. 15-CV-1340 (JS) (AKT), 2017 WL 3446806, at *10 (E.D.N.Y. Aug. 10, 2017) (collecting cases).

NYCBOE, a department of New York City, is by definition, a state actor.  *See Johnson*, 2018 WL 1597393, at *19 ("[T]he City is by definition a state actor.").  Murray labels Mercedes and Carr "individual defendants" (SAC ¶ 1); however as state employees who are alleged to have acted within the context of their state employment, they, too, are state actors, and Murray does not offer any facts to allege otherwise.  *See Johnson*, 2018 WL 1597393, at *19 (where plaintiff failed to allege any facts that city employees did not act under color of state law, they were state actors).  In *Vega*, the Second Circuit confirmed that "public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law," and found that defendants acted under

color of state law as employees of a public school.  801 F.3d at 87–89 (citing *Back v. Hastings-on-Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122–23 (2d Cir. 2004)).

While some courts have construed a plaintiff's § 1981 claim as encompassed by her § 1983 claims, Murray has not asserted § 1983 claims at any point in this proceeding.  (*See generally* SAC.)  *See, e.g.*, *Westbrook v. City Univ. of New York*, 591 F. Supp. 2d 207, 223 (E.D.N.Y. 2008) (construing § 1981 claim as arising under § 1983 because plaintiff had alleged and briefed similar claims under § 1983).

Given that Murray asserts claims against state actors, and she fails to plead under § 1983, her § 1981 claims are dismissed.

### g. Retaliation Claims Under Title VII and the ADEA

For a retaliation claim to survive a motion to dismiss under Title VII or the ADEA, a plaintiff must plausibly allege that: "(1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice."  *Vega*, 801 F.3d at 90; *see also Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (recognizing that Title VII and the ADEA contain "nearly identical provision(s) prohibiting retaliation," and "the same standards and burdens apply to claims under both statutes" (citation omitted)).

The "concept of an 'adverse employment action' is broader in the retaliation context than in the discrimination context," *Chung v. City Univ. of New York*, 605 F. App'x 20, 23 n.1 (2d Cir. 2015) (citation omitted), as the adverse action need not affect the terms and conditions of employment.  *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (internal quotation marks omitted) (citation omitted).  Instead, for purposes of alleging retaliation, a plaintiff may show that the adverse action "well

27

might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 262 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

   With respect to the second element, opposition to an unlawful employment practice, such as complaining about discrimination, is considered protected activity. *Id.* The protected activity must be the "but for" cause of the adverse action; there must be a plausible allegation that "the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *Kopchik v. Town of E. Fishkill*, No. 18-CV-1182, 2018 WL 6767369, at *3 (2d Cir. Dec. 26, 2018). Plaintiffs may demonstrate causal connection by showing that "the protected activity was closely followed in time by the adverse action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal quotation marks omitted) (citation omitted).

   The Second Circuit has held that "each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice," and that "claims tied to discrete acts in an ongoing adverse employment action that occurred within the statute of limitations period are not time-barred." *Vega*, 801 F.3d at 79. To the extent that Murray alleges retaliation under Title VII and the ADEA based on incidents that occurred prior to July 5, 2013, these claims must be dismissed as time-barred.

   Murray proffers a theory that defendants retaliated against her through various acts after she submitted a complaint about age and race discrimination with the OEO in March 2013. (*See e.g.*, SAC ¶¶ 21, 29, 42, 44.) The Court addresses each alleged retaliatory act in turn.

   First, to the extent that Murray argues that defendants retaliated by issuing negative performance reviews for the school years ending in June 2011, June 2012, and June 2013, (Pl.

Mot. at 11), these events fall outside the applicable limitations period, and thus, Murray cannot proceed on this basis.

Next, Murray alleges that Mercedes triggered an investigation into her by "fabricating allegations" of misconduct to the SCI "[s]hortly" after she filed the OEO complaint. (SAC ¶ 21.) She also alleges that Carr Lagomarsini made false statements in support of the investigation. (*Id*.) The second amended complaint does not indicate when Murray learned about the SCI's investigation. However, the § 3020-a opinion states that Murray and Mercedes met to discuss the report of the SCI, and a letter, dated June 28, 2013, "memorialized" this meeting. (§ 3020-a Hearing Opinion, Ex. B to Reiter Decl. (Doc. No. 38-2) at 50.) At the latest, then, Murray became aware that she suffered harm for which she might recover damages in a retaliation action on June 28, 2013. Thus, Murray's claim accrued before July 5, 2013, and is time-barred. *See Eagleston*, 41 F.3d at 871 (Claims accrue when plaintiff "knows or has reason to know of the harm.").

Further, Murray alleges that NYCBOE retaliated by initiating § 3020-a "disciplinary termination charges" in October 2013. (SAC ¶ 24.) However, Murray has not plausibly alleged that NYCBOE instituted charges "because" she filed the OEO complaint. The § 3020-a charges accused Murray of 25 specific acts of misconduct, 17 of which were sustained by the hearing officer. (§ 3020-a Hearing Opinion at 57.) Of those 17 acts, at least nine occurred before Murray allegedly filed the OEO complaint in March 2013, and are supported by letters, dated before March 2013, documenting ongoing misconduct. Thus, given the number of letters filed before March 2013 memorializing ongoing allegations of misconduct, it cannot reasonably be said that NYCBOE would not have filed disciplinary charges "in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846. Murray has failed to raise a plausible inference that she

had to endure the § 3020-a hearing as a result of protected activity, rather than as a result of other misconduct that predated any cause for retaliatory motive. *See Mazur*, 53 F. Supp. 3d at 639 ("[A]n independent tribunal's findings, although not *per se* preclusive, can negate the causal link between Plaintiff's protected activity and the resulting adverse action.") (citation omitted); *see also Elgalad v. N.Y.C. Dep't of Educ.*, No. 17-CV-4849 (VSB), 2018 WL 4572237, at *9 (S.D.N.Y. Sept. 24, 2018) (plaintiff alleged no facts to raise a plausible inference that § 3020-a disciplinary charges were prompted by retaliatory motive rather than because of his "various workplace performance issues"); *Smith v. Johnson*, No. 14-CV-3975 (KBF), 2014 WL 5410054, at *3 (S.D.N.Y. Oct. 24, 2014) (dismissing retaliation claim where the plausible inference was that plaintiff suffered adverse action not as a result of protected activity, but due to lateness and performance issues), *aff'd*, 636 F. App'x 34 (2d Cir. 2016). As Murray has failed to allege a sufficient causal connection, she cannot pursue this claim.

Murray also alleges that she was reassigned to out-of-license duties as a result of her OEO complaint. Although Murray was tasked with out-of-license duties starting in at least January 2013, she was also required to perform out-of-license tasks after July 5, 2013, and thus these acts are timely, as each incident of retaliation "constitutes a separate actionable unlawful employment practice." *Morgan*, 536 U.S. at 114. "Retaliatory work assignments" are a "classic and widely recognized example of forbidden retaliation." *White*, 548 U.S. at 71 (internal quotation marks omitted) (citation omitted). In fact, "[e]mployers have been enjoined under Title VII from imposing unpleasant work assignments upon an employee for filing charges." *Id*. (internal quotation marks omitted) (citation omitted). Whether or not a reassignment of job duties constitutes an adverse action "should be judged from the perspective of a reasonable

person in the plaintiff's position, considering all of the circumstances." *Id*. (internal quotation marks omitted) (citation omitted).

Murray specifically alleges that after the § 3020-a charges were filed in October 2013, she was reassigned to shred non-confidential paper and clean an unsanitary basement storage room, among other things.  (SAC ¶¶ 24, 27.)  Courts have found that the threat of "significantly diminished job responsibilities could reasonably dissuade an employee from engaging in protected activity." *Aponte v. Modern Furniture Mfg. Co., LLC*, 2016 WL 5372799, at *15 (E.D.N.Y. Sept. 26, 2016) (citation omitted); *see also Kessler*, 461 F.3d at 209–10; *Saber v. N.Y. State Dep't of Fin. Servs.*, No. 15-CV-5944 (LGS), 2017 WL 985889, at *14 (S.D.N.Y. Mar. 10, 2017) (retaliation claim survived summary judgment where plaintiff alleged that he received "lesser assignments" in the months following his EEOC charge).  While defendants reduced Murray's capacity as a social worker even before she alleged discrimination, it is plausible that they further diminished her responsibilities after the filing of the OEO complaint.  A reasonable person, especially a trained social worker, could view the assignments of cleaning an unsanitary basement and shredding nonconfidential papers as sufficiently unpleasant to warrant a finding that Murray would not have received these assignments "in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.  Thus, at this stage of the proceeding, Murray has plausibly stated a retaliation claim on this basis.

To the extent that Murray alleges she was required to submit to an unwarranted psychiatric evaluation as a result of protected activity, she has not provided enough information for the Court to ascertain the series of events that led to the evaluation.  (SAC ¶ 26.)  Without understanding the circumstances under which Murray was "remove[d]" from the office by

"School Safety" or the reason for the psychiatric evaluation, the Court cannot analyze the viability of this claim.  (*Id*. ¶ 25.)

Similarly, Murray's statement that she was "constructive[ly]" discharged in June 2017, coupled with her assertion that she "left" NYCBOE in September 2017, leaves the Court unable to understand the circumstances of her departure.  (*Id*. ¶¶ 8, 42, 44.)

Finally, Murray's claim that Mercedes "illegally docked her seventeen days" of her paycheck in July 2015 is too attenuated to serve as the basis for a retaliation claim.  (*Id*. ¶ 34.) The deprivation of her paycheck occurred over two years after Murray filed the OEO complaint. While retaliatory purpose may be shown when a protected activity is followed "closely in time by the adverse action," and the Second Circuit has declined to draw a "bright line defining . . . the outer limits beyond which a temporal relationship is too attenuated to establish causation," an interim of two years between the protected act and retaliation is too long for this Court to infer causation without further details from Murray.  *Cf. Vega* 801 F.3d at 92 (retaliation plausibly alleged where school wrongfully deducted funds from plaintiff's paycheck "just two months" after he added allegations to his EEOC complaint).

Accordingly, Murray may pursue her claims of retaliation based on diminished job responsibilities.  With respect to all other claims of retaliation asserted under Title VII and the ADEA, NYCBOE's motion to dismiss is granted.

### h.  State and City Law Claims

The second amended complaint contains no reference to New York State's Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, or New York City's Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.  In a letter to the Court, counsel for Murray confirmed, "Plaintiff is no longer pursuing SHRL and CHRL claims in her second amended

complaint . . . ."  (10/17/2017 Ltr. (Doc. No. 35) at 1.)  However, in opposition to defendants'

motion to dismiss, Murray states that "claims under state and city law . . . should proceed at this

stage."  (Pl. Mot. at 13.)

Murray may not amend her complaint through motion papers.  It is "axiomatic that the

Complaint cannot be amended by briefs in opposition to a motion to dismiss."  *O'Brien v. Nat'l*

*Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (citations omitted); *see also*

*Scott v. Greenberg*, No. 15-CV-05527 (MKB), 2017 WL 1214441, at *18 (E.D.N.Y. Mar. 31,

2017) ("Plaintiff cannot rely on allegations made for the first time in opposition to a motion to

dismiss in order to save the Amended Complaint." (citations omitted)).  Not only did Murray fail

to assert any claims under NYSHRL or NYCHRL in the second amended complaint, but she

affirmatively abandoned those claims.  (*See* 10/17/2017 Ltr. at 1.)  Accordingly, to the extent

that Murray attempts to assert state or city law claims, they are not properly before the Court on

this motion, and they will not be considered.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (Doc. No. 37) is granted in part

and denied in part.  Murray may pursue her claims of race and age discrimination, and hostile

work environment under Title VII and the ADEA.  Murray may also pursue her retaliation

claims under Title VII and the ADEA with respect to the diminishment of her job

responsibilities.  Murray's claims under § 1981, NYSHRL, and NYCHRL are dismissed without

prejudice.  As the only claims pled against Robert Mercedes and Susan Carr Lagomarsini have

been dismissed, the Clerk of Court is directed to terminate them as defendants.

This case is recommitted to Magistrate Judge Tiscione for supervision of all pre-trial matters.

SO ORDERED.

Dated: Brooklyn, New York
March 21, 2019

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge